1  Patrick Emerson McCormick (AZ Bar No. 037036)
   PMcCormick@lewisroca.com
2  **LEWIS ROCA ROTHGERBER CHRISTIE LLP**
   One South Church Avenue, Suite 2000
3  Tucson, Arizona 85701
   Telephone: (520) 622-2090
4  Facsimile: (520) 622-3088

5  Eric Levinrad* (CA Bar No. 169025)
   elevinrad@ecjlaw.com
6  Amy S. Russell* (CA Bar No. 284131)
   arussell@ecjlaw.com
7  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Twelfth Floor
8  Beverly Hills, California 90212-2974
   Telephone: (310) 273-6333
9  Facsimile: (310) 859-2325
   * *Pro Hac Vice Applications Forthcoming*
10
   Attorneys for Defendants Alissa
11 Chiaravanond, Pacific Shangrila LLC,
   Cathedral Shangrila LLC, Nido di Stelle LLC,
12 and ILU LLC

13              **UNITED STATES DISTRICT COURT**

14              **DISTRICT OF ARIZONA, PRESCOTT**

15

16 PHONG THANH HUYNH,                    | Case No. 3:23-cv-08622-JJT

17        Plaintiff,                      | The Hon. John J. Tuchi, Courtroom 505

18    v.                                  | **DECLARATION OF ALISSA
                                          | CHIARAVANOND IN SUPPORT OF
19 ALISSA CHIARAVANOND, an               | DEFENDANTS' MOTION TO SET
   individual; PACIFIC SHANGRILA LLC,    | ASIDE ENTRY OF DEFAULT**
20 a Nevada limited liability company;   |
   CATHEDRAL SHANGRILA LLC, a            | *[Filed Concurrently with Motion;
21 Nevada limited liability company; NIDO| Memorandum of Points and Authorities;
   DI STELLE LLC, a Nevada limited       | Declaration of Eric Levinrad; [Proposed]
22 liability company; and ILU LLC, an    | Order]*
   Arizona limited liability company,    |
23                                        |
          Defendants.                     |
24

25

26

27

28

11204870.1                          1
                    DECLARATION OF ALISSA CHIARAVANOND

**DECLARATION OF ALISSA CHIARAVANOND**

I, Alissa Chiaravanond, declare as follows:

1.       I am one of the named defendants in this action.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.       I previously served as a board member of FWD Life Insurance, Thailand  (FWD Group) ("FWD") in Thailand, and later became FWD's consultant and business partner at their request. During the time that I served as a board member at FWD, Plaintiff Phong Huynh ("Huynh") was serving as FWD's Chief Executive Officer ("CEO") at the group level in Hong Kong.  While I was an independent board member of FWD, I viewed Huynh as my mentor.

3.       Huynh's and my relationship transitioned from a mentor-mentee relationship into a romantic relationship in 2018.  Although Huynh was married at this time, he told me that he was separated from his then wife and was in the process of getting a divorce, after which he and I could get married.  I then introduced him to my family, as it is customary to seek my family's approval of a serious committed relationship.  In the Fall of 2018, Huynh told my family of his intentions to marry me.  We formally announced our engagement to my family in January 2020, and Huynh gave me an engagement ring at that time.

4.       In Thai culture, before a couple gets married a groom typically pays either his fiancée or his fiancée's family a sum of money, called "sin sod," also known as a Thai dowry.  When the groom is a wealthy, successful man, the amount of cash paid for this dowry can be significant.  Traditionally, under Thai culture, dowry money that is paid to a bride-to-be or her family is considered to be an irrevocable gift, to be used as the bride-to-be or her family see fit.  In Thai culture, even if a bride-to-be chooses not to go forward with the wedding, the dowry money is kept by the bride-to-be, even if the wedding does not take place.

ERVIN COHEN & JESSUP LLP

11204870.1

2

DECLARATION OF ALISSA CHIARAVANOND

5.      Although dowry money is traditionally paid to the bride's family, it is frequently also paid to the bride herself.  My family in Thailand are known to be among the wealthiest families in Thailand.  As such, in our case, it made more sense for Huynh to give the dowry  directly to me, rather than to my far wealthier parents.

6.      Huynh expressly told me on numerous occasions that he was giving me money to purchase houses as a dowry.  In the Spring of 2019, Huynh joined me in Sedona, Arizona. During this visit I told him that I love Sedona and it's nature, and plan to buy a home there at some point. He then started talking about FWD's IPO, which he expected to significantly increase his wealth, and said that for my dowry he would buy me a few homes in various places, including Sedona.  In the Fall of 2019, I was interested in purchasing a house in Phuket, Thailand, and Huynh later joined me in Phuket to look at houses within the budget that I had set for myself. Because no houses close to the beach in Phuket fell within my budget, Huyhn said to me that he would like to get me a house in Phuket that was closer to the beach for my dowry. For this purpose (and after  officializing our engagement), Huyhn transferred $3.5 million to Trilliant, a company which I solely own and had set up much earlier for the purpose of entering into my various business contracts and partnerships with FWD Group and affiliates.  I ultimately ended up not purchasing a property in Phuket due to the Covid 19 pandemic and the very strict travel restrictions placed by the Thai government in March 2020.  Instead, Huyhn agreed to buy me several properties in the United States as my dowry.  In January 2021, I purchased a property in Sedona, using the $3.5 million that Huynh had transferred to Trilliant for the Phuket property.  Huynh also transferred approximately an additional amount of $4 million to me to use to purchase a house in Malibu.  Again, Huyhn told me that he was giving me money to purchase this house as part of my dowry.  I also purchased an adjacent piece of vacant land next to the Malibu House, but this was purchased with my own money.  Later, in July 2021, Huynh transferred me an additional approximately $5 million to purchase a second house in Sedona,

DocuSign Envelope ID: C5D96B33-7817-4027-B0C4-D51156646708F

1   which he also told me he was giving me as my dowry.

2        7.    Huynh and I both discussed and understood that the properties that I
3   purchased with this money would be owned by me only, and that Huynh would not
4   have any ownership interest in those properties.  When I purchased these properties,
5   with Huynh's full knowledge and agreement, I set up sole purpose LLCs of which I
6   was the only member, to hold title to these properties. I told Huynh that I was setting
7   up LLCs to hold title to the properties.  Huynh never asked to be on title to the
8   properties and never asked for any membership interest in the LLC's that held title
9   to these properties.  There are no documents of which I am aware evidencing any
10  intention for Huynh to hold any interest in these properties, because that was neither
11  his nor my intention at the time that I purchased the properties.  I also never
12  represented to Huynh that he would hold any ownership interest in the properties or
13  in the LLC's which I set up to hold title to those properties.

14       8.    Huynh and I got married in Vancouver, British Columbia on May 1,
15  2022.

16       9.    In the months following our wedding, I learned numerous things about
17  Huynh that made me question our marriage.  As just one example, six weeks after
18  our wedding, Huynh told me that he was suffering severe financial difficulties.  In
19  fact, during our marriage, Huynh approached me on two to three occasions and
20  asked me to obtain a loan for him from my father in the amount of $30 million.  I
21  declined to request that my father loan such a large amount of money to Huynh and
22  came to believe that Huynh had perhaps married me in order to gain access to my
23  family's wealth and prestige, which was extremely upsetting to me. For this, and
24  various other reasons that were disturbing, including but not limited to my
25  contracting potentially dangerous infections from Huynh which he had not disclosed
26  to me, I no longer wanted to remain married to Huynh and engaged attorneys in
27  Singapore, to represent me in this regard.

28       10.    Before any legal proceedings to end my marriage were filed by my

ERVIN COHEN & JESSUP LLP

11204870.1          4

DECLARATION OF ALISSA CHIARAVANOND

1  Singapore counsel, they reached out to Huynh in late August 2023 in an attempt to

2  see whether the parties could agree to an amicable separation, prior to filing a

3  Petition for Writ of Nullity in Singapore on my behalf on October 9, 2023.

4      11.    After my Singapore counsel reached out to Huynh, Huynh's conduct

5  towards me by him and his associates became increasingly aggressive and

6  frightening to me.

7      12.    For example, in mid-September 2023, a fictitious Instagram account

8  was set up, purporting to be mine, on which certain of my private pictures and

9  family pictures were posted.  My family members, friends , and work colleagues

10  were "friended" on this account and the account holder engaged in conversations

11  with these people pretending to be me. Because Huynh was the only person who had

12  access to some of these private pictures, and the substance of the posted comments

13  and conversations exchanged with my associates, I believe that he or persons

14  working at his direction set up this fake Instagram account.  Photos of my Los

15  Angeles home and ex- husband were also posted here, including derogatory

16  hashtags. Because I was not communicating with Huynh at this time, I contacted

17  Richard Li, Huynh's superior at FWD, with whom I am also acquainted.  I told Mr.

18  Li about this fake Instagram account that had been set up and told him that this was

19  a serious security concern for me and my family.  I also told him that if it was not

20  taken down within a few days we would have no choice but to report this matter to

21  the police.  Following this conversation, the Instagram account was slowly taken

22  down, a little bit at a time, and was completely gone by the deadline which I had

23  communicated to Mr. Li.

24      13.    After this Instagram incident, Huynh resumed his communications with

25  me, and tried to convince me to return to the marriage. I confronted him about the

26  fake Instagram account that had been set up, and he did not deny his involvement in

27  this incident.  My belief that Huyhn had set up this fake Instagram account caused

28  me to become more fearful of Huyhn.

ERVIN COHEN & JESSUP LLP

11204870.1                                5
DECLARATION OF ALISSA CHIARAVANOND

14.    Then, in late September 2023, I received a call from Mr. Li, who is the founder and largest shareholder of FWD and is a very prominent businessperson in Asia.  During this call, Mr. Li accused me of causing drama by filing the petition for nullity against Huynh, and repeatedly told me that I needed to "calm down." In sum and substance, Mr. Li told me to go back to my marriage with Huynh.  During this conversation, Mr. Li referred to Huynh as a "tough guy," and said something to the effect of "if you don't go back, mark my words, you will regret this."  I understood this to be a threat.

15.    As a result of these intimidating incidents, I became extremely fearful of Huynh, particularly after he filed the instant lawsuit against me in Arizona before our matrimonial mediation pending in Singapore.  Although I understand that the lawsuit had previously been served on the LLC Defendants through their corporate agents for service, I only became aware of the lawsuit when the papers were personally served on me at my home in Sedona. Following the service of the lawsuit on me, various incidents occurred which caused me to fear for my physical safety.

16.    For example, within days of the service of the papers on me, I was driving my car on a mountain road in Sedona, and a black sedan followed me for many miles, driving extremely closely to my car in an aggressive and dangerous manner that made me fear that I might be forced off the road by this car.

17.    Additionally, in mid-January 2024, approximately two weeks before the service of the lawsuit on me at my home in Sedona, I came to believe that my electronic devices which I used at my Sedona home, including my smart phones and my laptop computer, had been hacked and improperly accessed and that my electronic communications were no longer secure.  I came to believe this based on the fact that all of the electronic devices in my home, including my cell phones, laptop and televisions seemed to be malfunctioning during this time frame and throughout early February.

18.    Approximately ten days after the papers related to this action were

11204870.1
6
DECLARATION OF ALISSA CHIARAVANOND

ERVIN COHEN & JESSUP LLP

served on me, I noticed a large drone aircraft, which was approximately two feet round, one foot high and covered with multiple red lights on its body,  flying within sight of my bedroom window.  I became particularly alarmed when I observed this drone aircraft land behind my bedroom, next to my equipment room, which contains gas lines and various equipment for my home, including a water pump, my home's air conditioning units, electrical boxes and hot water heater.  This occurred at around midnight.  This terrified me, because I thought that the drone may carry explosive devices, and because I thought that persons operating the drone must be nearby surveilling me.

19.    Based on these incidents, I became extremely scared and concerned about my physical safety, and no longer felt safe alone in my remote Sedona home.  I also felt isolated and unable to use my electronic devices to securely communicate with anyone.  The very next morning, I left my home and drove to the town of Sedona where it appeared to me that I was being followed.  I abandoned my car and rented a motel room in the town of Sedona, and stayed in motel rooms in Sedona for 13 nights, changing my motel room every few days due to my fear for my physical safety.

20.    After 13 days of staying in motel rooms in Sedona, I returned to my house in Sedona, but still did not feel safe and still believed that my devices were being compromised and that I was being surveilled and tracked, and did not know how to safely leave Sedona without being tracked. After approximately ten days back in my house, I left the area altogether, and drove to a location outside the state of Arizona.  Once I arrived in this new location, I purchased an anonymous phone so that I could communicate on what I believed to be a more secure device.  In late March 2024, I was able to engage counsel to represent me in this action.   The reason that I was unable to respond to the complaint in a  timely manner, was because I was not able to hire counsel to represent me, due to the fears and concerns that are described above.

DECLARATION OF ALISSA CHIARAVANOND

1    I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct to the best of my knowledge.

3         Executed April 3, 2024, at Beverly Hills, California.

4

5    DocuSigned by:

     *Alissa Chiaravanond*
     4AE1ED88C4C9472...

     Alissa Chiaravanond

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11204870.1                                8

DECLARATION OF ALISSA CHIARAVANOND

**PROOF OF SERVICE**

I, Daniela Rodriguez, declare:

I am a citizen of the United States and employed in Pima County, Arizona. I am over the age of eighteen years and not a party to the within-entitled action. My business address is One South Church Avenue, Suite 2000, Tucson, Arizona 85701-1611.

On April 3, 2024, I electronically transmitted the following document:

> DECLARATION OF ALISSA CHIARAVANOND IN SUPPORT
> OF DEFENDANTS' MOTION TO SET ASIDE ENTRY OF
> DEFAULT

to the Clerk's office using the CM/ECF System for filing and served through the Notice of Electronic Filing automatically generated by the Court's facilities.

I declare under penalty of perjury under the laws of the State of Arizona that the above is true and correct.

Executed on April 3, 2024, in Tucson, Arizona.

/s/ *Daniela Rodriguez*
Daniela Rodriguez