Devin Sreecharana, Esq. (029057)
MAY, POTENZA, BARAN & GILLESPIE, P.C.
1850 N. Central Ave., Suite 1600
Phoenix, Arizona 85021
Telephone: (602) 252-1900
Facsimile: (602) 252-1114
Email: devin@maypotenza.com

Moshe Y. Admon, Esq. (034169)
Admon Law Firm, PLLC
300 Lenora St., #4008
Seattle, Washington 98121
Telephone: (206) 739-8383
Email: jeff@admonlaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Phong Thanh Huynh,<br><br>  Plaintiff,<br><br>v.<br><br>Alissa Chiaravanond, an individual resident of Arizona, Pacific Shangrila LLC, a Nevada limited liability company, Cathedral Shangrila LLC, a Nevada limited liability company, Nido di Stelle LLC, a Nevada limited liability company, ILU LLC, an Arizona limited liability company,<br><br>  Defendants. | Case No.: 3:23-cv-08622-JJT<br><br>**RESPONSE TO MOTION TO SET ASIDE ENTRY OF DEFAULT**<br><br>**(Assigned to the Hon. John J. Tuchi)**<br><br>**(Oral Argument Requested)** |

Defendants' Motion to Set Aside Entry of Default (Doc. 28) (the "Motion") provides an unbelievable story in a "Hail Mary" attempt to set aside default as to each Defendant that was indisputably and properly served. The Motion should be denied because:

1. Defendants' conduct is culpable because they each had actual and constructive notice of this action and, notwithstanding their legal sophistication, intentionally failed to respond;
2. Defendants have failed to articulate a meritorious defense supported by credible evidence; and,
3. Setting aside default will prejudice Phong because the Defendants will continue to remain in unlawful possession of the Investment Properties and his cash.

Importantly, any of these reasons is sufficient to deny the Motion. Accordingly, Plaintiff Phong Thanh Huynh ("Phong") respectfully requests this Court deny Defendants' Motion in its entirety and as to each Defendant.

The following Memorandum of Points and Authorities and the record support this Response.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. FACTUAL BACKGROUND

Defendant Alissa Chiaravanond ("Alissa") is not a stranger to marriage or its benefits – this is her third. The eldest niece of one of Thailand's wealthiest individuals, she is a U.S. and Thai citizen who enriched herself through each union. Both her previous marriages ended in divorce nearly a year into marriage and both left her with properties and money most can only imagine. She targeted her affluent victims and devised elaborate schemes to extract millions of dollars in real property as part of each divorce/separation. Alissa has also failed to pay creditors and used unlawful mechanisms to relieve herself of debts on several of those properties.

Barely a year after Alissa's and Phong's Canadian marriage, Alissa moved to nullify the parties' marriage in Singapore. Her sole intent in doing so was to defraud Phong of approximately $17 million in upscale Arizona and California investment properties – which

2

he secured through financing for which he's solely responsible – and cash which transferred to renovate, upkeep, and rent those properties, all of which were actually meant provide for Phong's retirement. The scheme's particulars are set forth in Phong's Complaint and generally referred to as the "Defalcation and Embezzlement Plan." (Doc. 1, ¶¶ 31-91).

Now, in a sadly predictable about-face, Alissa asks this Court to believe that Phong gifted her nearly $17 million as part of a Thai dowry, with no intention to benefit himself in any way, let alone create his retirement nest egg. That claim is a (not so) creative prevarication because:

1. A dowry is symbolic. It's offered as a sign of respect to the bride's family and a cornerstone in the foundation of building a life together. The sum given is not meant to bankrupt the husband.  While untrue, Alissa herself alleges the nearly $17 million Thai dowry is a significant portion of Phong's net worth.

2. In Thailand, dowry is given during a formal ceremony on the day of the wedding "in which accepting family members will attend." Dowry will be "paid by the groom to the bride's family… However, if the bride is 'spoiled or ruined' (Mia Maiy), no Thai dowry will be required, as well as if she comes along with her children of a former marriage.'"[1]  This was Alissa's third marriage, there was no formal ceremony, and the alleged dowry was not paid to Alissa's family, which is all inconsistent with Thai custom.

3. Alissa is a U.S. and Thai citizen. Phong is a Vietnamese national and a Canadian citizen. The parties were married in Canada—not Thailand.

4. There is no "dowry" contract, there was no dowry ritual, nor is there other written evidence of a gift—only Alissa's self-serving declaration.

5. Phong is unaware of any Thai dowry allegedly pledged to Alissa in her prior marriages.

---

[1] *Thai Dowry,* ThaiEmbasy.com, https://www.thaiembassy.com/thailand/dowry-in-thailand#:~:text=Thai%20dowry%2C%20%27Sin%20Sod%27,completely%20likely%20and%20very%20common (last accessed 4/14/24).

3

### A.  Alissa's First Marriage & Tilden Property Transfer

In June 2008, Alissa separated from her first husband, Ismael Corpas Moreno, and in November 2009, her marital settlement agreement with Moreno was approved (No. BD512387, filed in the Superior Court for Los Angeles County, California on September 17, 2009).[2] From that divorce, Alissa was awarded real property located at 709 Tilden Avenue, Los Angeles, California ("Tilden Property").

In March 2010, OneWest Bank issued a notice of default on the Tilden Property for $21,632.80. A trustee's sale occurred to satisfy the mortgage balance and other charges, totaling $618,727.58. Through a public auction, OWB REO, LLC purchased the Tilden Property for $512,690.45. OWB REO, LLC then sold the Tilden Property to Chanatip Leksrisompong for $475,000. Chanatip, then transferred the Tilden Property back to Alissa, receiving nothing in return. Chanatip documented the transfer to Alissa as a gift. In sum, it appears Alissa orchestrated a scheme to recover the Tilden Property, post-default, for no consideration.

### B.  Defendant's Second Marriage

In 2017, Alissa filed for divorce from Schuyler Moore in California. Findings and Order After Hearing, Exhibit A. Moore was a 61-year-old widower coping with advancing multiple sclerosis ("MS"). *Id.* at 3.

As part of that divorce proceeding, Moore alleged that Alissa pressured him to sign a post-nuptial ("Post-Nup") agreement under which she would receive $5 million from him if they divorced. "Moore was unusually vulnerable because of his declining health and acceded to her threats, fearing the prospect of losing [Alyssa] while struggling to cope with his advancing MS. Within *three months* of signing the Post-Nup, [Alyssa] filed for divorce and

---

[2] The Court can take judicial notice of this record. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002)), and of "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith*, 307 F.3d at 1125–26; *see also* Fed. R. Evid. 201.

4

sought to compel Moore to pay the $5 million [Alyssa] claimed that she was owed under the Post-Nup." *Id.* at 3. (emphasis added). Alongside their divorce case, Moore separately accused Alissa of invading his privacy because she installed cameras and other equipment in Moore's house to spy on him. Third Amended Complaint, Exhibit B. She did so based on the unsupported claim that Moore was unfaithful after they married. Findings and Order After Hearing, Ex. A, at 3:22-24.

### C. <u>Alissa meets, marries, and defrauds Phong</u>

Shortly after her divorce from Moore, Phong and Alissa began dating in September 2018 and then married on May 1, 2022, in Canada. They were in a relationship and married during the Defalcation and Embezzlement Plan. On August 31, 2023, less than a week following Phong's final transfer of funds to Alissa related to the Defalcation and Embezzlement Plan, Alissa served Phong with notice of her intent to nullify their marriage. (Doc. 1 at ¶¶ 24, 75, 77,81); Ex. A at ¶ 7. Alissa's desired marital nullification was premised on provably untrue claims. *See* Exhibit C at Exhibit 1 thereto.

From the beginning of their relationship, Alissa represented to Phong, a foreign national, that she was an experienced real estate investor with a history of profitable investments in real estate in the United States. (Doc. 1, ¶ 22). Alissa also represented to Phong that because she was a U.S. citizen, it would be beneficial to Phong to invest in U.S. properties which she could purchase through limited liability companies (LLCs). She further represented to Phong that she would manage these LLCs and facilitate their leasing to generate monthly profits exclusively for Phong's benefit (and their collective financial security should they later marry). *Id.* ¶¶ 25, 29, 30. Phong relied on Alyssa's representations, in part because he trusted her, and, given her affluent pedigree as a scion of one of Thailand's wealthiest families, she seemed an unlikely candidate to defraud him of his money. Therefore, Phong agreed to move forward, as Alissa proposed, with purchasing the subject properties.

Alissa, as part of the Defalcation and Embezzlement Plan, specifically and falsely represented that these properties would be held in LLCs wholly owned by another Phong-controlled entity, "Trilliant Group." According to Alissa, an offshore Trust/LLC solely owned

and controlled by Phong would own Trilliant Group. *Id.* ¶¶ 32-33. However, in furtherance of her Defalcation and Embezzlement Plan, Alissa in fact exclusively manages and controls Trilliant Group and thus, the Corporate Defendants. *Id.* ¶ 45.

In furtherance of her Defalcation and Embezzlement Plan, Alissa coordinated the purchase of properties solely using Phong's funds. *Id.* ¶¶ 39, 41-43, 46-47, 52-53, 57, 63-64, 70, 76-77. The dates of the fund transfers and the amounts are specifically set forth in the Complaint. *Id.* ¶¶ 39, 41-43, 46-47, 52-53, 57, 63-64, 70, 76-77. The at-issue properties are identified in the Complaint as the *Malibu House, Malibu Land, Sedona House 1, and Sedona House 11* and collectively referred to as the "Investment Properties." *Id.* ¶¶ 4,5,6,7,8,10. Pacific's sole purpose is to hold title to the *Malibu House*. *Id.* ¶ 4. Cathedral's sole purpose is to hold title to the *Sedona House 1. Id.*, ¶ 6. Nido's sole purpose is to hold title to the *Sedona House 2* and the *Sedona Land. Id.*, ¶ 8. ILU's sole purpose is to hold title to the *Malibu Land. Id.*, ¶ 10.

At no time did Phong represent, intend, or understand that the transfers for the Investment Properties were a gift or dowry. However, contrary to her earlier representations to Phong, Alissa now purports to wholly own and is identified in corporate filings as the sole member of each Corporate Defendant because, she says, they were for a dowry. Several communications and interactions during a two-year period demonstrate Phong had an interest in the Investment Properties and was not just the "money guy." For example:

- Between January 2020 and August 2021, when authorizing at least 5 separate transfers of funds related to the Investment Properties, Phong noted the purpose of the transfer was for an "Investment." Ex. A at Exhibits 2-6 thereto.
- In June 2020, during the inspection period for purchasing one of the Investment Properties, Phong was copied on emails with the opposing realtor. Email chain with Mark Goldsmith, Ex. A at Exhibit 15.
- In January 2021, Phong was included on various emails related to inspections for and earnest money deposits related to Sedona House 1. Ex. A at Exhibit 7 thereto.

6

- In April 2021, Phong became connected with a United States attorney to seek advice related to his personal investments in United States real estate. Email Chain with Gregory Pyke, Ex. A at Exhibit 8 thereto. In describing the help he needed, Phong wrote:

  > At the moment, we have bought each property using a separate LLC except for one which is still under the personal name of my fiancé. We have also set up a separate LLC to handle the expenses associated with these investments While my fiancé is a US citizen and has invested in real estates in the States before, I am totally unfamiliar being a Canadian citizen working in Asia. We just want to make sure we set things up properly to minimize tax leakage & also in a way that we can getting leverage from these properties (or the hold co). We have so far paid cash for all of them

  *Id.* Alissa was not on those emails. *Id.*

- In July 2021, Phong exchanged emails with a realtor in Arizona related to the inspection of Sedona House 2 and with the homeowner's association in which Sedona House 2 lies. Ex. A at Exhibits 9, 10 thereto. Alissa was not on either of those email chains.

- In September 2022, Alissa exchanged WhatsApp messages with Phong describing rental prices, to which Phong responded "Cool! Cash flow!" Ex. A at Exhibit 11 thereto.

- In August 2023, Alissa and Phong exchanged emails containing an accounting of Loan and Disbursement Records, including an accounting of loans and transfers related to the Investment Properties. Ex. A at Exhibit 12 thereto. Within those emails, Alissa said on August 21, 2023, at 11:21 "This says you transferred more so *it means we have more assets available than you think*." *Id.* (emphasis added).

By misrepresenting the method and manner of the properties' acquisition and ownership and that she acted for Phong's exclusive benefit to purchase and renovate the Investment Properties, Alissa induced Phong to transfer, by wire and in cash, $15,445,000 to her personally and the Corporate Defendants which she solely owns and controls. Compl.

7

¶ 78.

At no time during the course of his transfer of funds to Alissa and the Corporate Defendants did Phong control or receive any benefit from ownership of the Trilliant Group, the Corporate Defendants, or the Investment Properties. At all times relevant to this case, Alissa controlled and benefitted from the Trilliant Group, Corporate Defendants, and Investment Properties, while Phong did not, despite her contrary representations to Phong.

## II.    **PROCEDURAL HISTORY**

Phong filed his Complaint on December 2, 2023. (Doc. 1). The Corporate Defendants were served and default was entered against each of them as follows:

1. Phong served Pacific by personal service on its registered agent, located at 401 Ryland St., Ste. 200A, Reno, NV 89502, on January 4, 2024 at 12:21 P.M. (Doc. 19 at Exhibit A at Exhibit 2). Pacific's deadline to respond to the Complaint was January 26, 2024. Pacific did not serve a pleading or otherwise defend itself in this action and more than 21 days passed since it was served. Phong applied for default against Pacific on February 14, 2024. (Doc. 18). The Clerk of Court entered default against Pacific on February 15, 2024. (Doc. 20).

2. Phong served ILU by personal service on its registered agent, located at 401 Ryland St., Ste. 200A, Reno, NV 89502, on January 4, 2024 at 12:21 P.M. (Doc. 19 at Exhibit A at Exhibit 1 thereto). ILU's deadline to respond to the Complaint was January 26, 2024. *Id.* ¶ 5. ILU did not serve a pleading or otherwise defend itself in this action and more than 21 days passed since it was served. Phong applied for default against ILU on February 14, 2024. (Doc. 18). The Clerk of Court entered default against ILU on February 15, 2024. (Doc. 20).

3. Phong personally served Cathedral by personal service on its registered agent, located at 401 Ryland St., Ste. 200A, Reno, NV 89502, on January 16, 2024 at 1:10 P.M. (Doc. 15 at Exhibit A thereto). Cathedral's deadline to respond to the Complaint was February 6, 2024. *Id.* at ¶ 5. Cathedral did not serve a pleading or otherwise defend itself in this action and more than 21 days passed

8

since it was served. Phong applied for default against Cathedral on February 7, 2024. (Doc. 14). The Clerk of Court entered default against default against Cathedral on February 12, 2024. (Doc. 16).

4. Phong served Nido by personal service on its registered agent, located at 401 Ryland St., Ste. 200A, Reno, NV 89502, on January 16, 2024 at 1:10 P.M. (Doc. 15 at Exhibit B thereto). Nido's deadline to respond to the Complaint was February 6, 2024. *Id.* at ¶ 5. Nido did not serve a pleading or otherwise defend itself in this action and more than 21 days passed since it was served. Phong applied for default against Nido on February 7, 2024. (Doc. 14). The Clerk of Court entered default against default against Nido on February 12, 2024. (Doc. 16).

5. Phong served Alissa by personal service on February 1, 2024 at 6:52 PM at 95 Cross Creek, Sedona, AZ 86336. (Doc. 22 at Exhibit A thereto). Alissa's deadline to respond to the Complaint was February 22, 2024. *Id.* at ¶ 4. Alissa did not serve a pleading or otherwise defend herself in this action and more than 21 days passed since she was served. Phong applied for default against Alissa on February 26, 2024. (Doc. 21). The Clerk of Court entered default against Alissa on February 27, 2024. (Doc. 23).

Notably, on January 19, 2024, Phong's counsel in the Singapore divorce case filed an Affidavit for Substituted Service stating that Phong had "commenced a civil suit against the Defendant in the USA and the process servers have attempted to serve the US papers and the Singapore Judicial Separation papers on the Defendant but to no avail." Ex. A at Exhibit 13 thereto. Phong attached Certificates of Attempted Service for the Defendants in this case. *Id.* Alissa's divorce counsel then appeared in that case on February 6, 2024. Ex. A at Exhibit 14 thereto.

In other words, by February 6, 2024, statutory agents for the Corporate Defendants, Alissa, and Alissa's divorce counsel were all indisputably aware of this lawsuit.

Service upon each Corporate Defendant was proper because Phong personally served

9

each of their registered agents with the Complaint and Summons, among other documents. *See* Fed. R. Civ. P. 4(h)(1). Service upon Alissa was proper because Phong personally served her with the Complaint and Summons, among other documents, within a Judicial District of the United States. *See* Fed. R. Civ. P. 4(e)(1). Each Defendant failed to plead or otherwise defend this action within 21 days of service upon them as required by Fed. R. Civ. P. 12(a)(1)(A). Therefore, the Clerk properly entered default against each Defendant as described above.

On March 22, 2024, Defendants' counsel reached out to Phong's counsel for the first time and asked Phong to stipulate to setting aside the defaults entered against each Defendant. After a March 26, 2024 phone call between the parties' counsel, Phong declined to stipulate because Defendants' counsel was unable to articulate good cause or a potentially meritorious defense. *See* Exhibit D.[3] Defendants' Motion was the very first time Phong became aware of Defendants' dowry theory.

On March 25, 2024, the Court ordered Phong to file a motion for default judgment within 15 days of the date of that order. (Doc. 27) Defendants' Motion followed. (Doc. 28) To preserve judicial and party economy, and upon the parties' stipulation (Doc. 31), the Court vacated its prior order requiring Phong to move for entry of default. (Doc.32)

## III.   LEGAL ANALYSIS

Federal Rule of Civil Procedure 55(c) provides that the "court may set aside an entry of default for good cause…" The Ninth Circuit applies a 3-factor test for determining whether good cause exists: "(1) whether the party seeking to set aside the default engaged in culpable conduct that led to the default; (2) whether it had no meritorious defense; or (3) whether reopening the default judgment would prejudice the other party." *United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010) [hereafter, *Mesle*]

---

[3] When asked during the parties' telephonic meet and confer about Defendants' alleged meritorious defenses, Defendants' counsel did not identify a single defense, let alone the "dowry defense," as justifying Defendants' requested relief. Instead, they reserved the right to later raise meritorious defenses. Defendants were either aware of the "dowry defense" at the time or concocted it in preparing their Motion.

(cleaned up). The factors are disjunctive, meaning that "a finding that any one of [them] is true is sufficient reason for the district court to refuse to set aside the default." *Id.*

### A. Defendants' conduct is culpable.

"A defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and *intentionally* failed to answer." *Mesle*, 615 F.3d at 1089 (emphasis in original). Defendants' conduct is culpable because both elements are satisfied.

#### 1. Defendants had actual and constructive notice of this action on or before February 6, 2024.

There should be no question that Defendants each had actual and constructive notice of this litigation on or before February 6, 2024. This element does not appear to be contested, as Defendants' Motion does not substantively address it. *See* (Doc. 28 at 12:11-13:22).

An entity receives actual notice of litigation when its registered agent is served **even if the entity's owner is not aware**. *CWT Canada II LP v. Danzik*, 2017 WL 1437557, *4 (D. Ariz. 2017) (citing Fed. R. Civ. P. 4(a), (h)) (emphasis added). A client in an attorney-client relationship is "considered to have notice of all facts known to their lawyer-agent." *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141–42 (9th Cir.1989).

As explained in Section II, each of the Corporate Defendants' registered agents and Alissa herself were served with the Complaint between January 4 and February 1, 2024, and Alissa's Singapore divorce counsel were aware of the lawsuit on or before February 6, 2024. Each scenario establishes actual and, at least, constructive notice nearly two months before Alissa's counsel first contacted Plaintiff's counsel on March 22, 2024 and her appearance on April 3, 2024.

#### 2. Defendants intentionally failed to answer.

"Intentional" has two meanings depending on the party's level of legal sophistication: where a party is not "legally sophisticated," "conduct is culpable where there is no explanation of the default inconsistent with a devious, deliberate, willful, or bad faith failure to respond," for example to "take advantage of the opposing party, interfere with judicial decision making, or otherwise manipulate the legal process." *Mesle*, 615 F.3d at 1089, 1092 (internal citations

11

omitted)); *Yoon Chul Yoo v. Arnold*, 615 Fed. Appx. 868, 869 (9th Cir. 2015) (same); *FOC Fin. Ltd. P'ship v. Nat'l City Commercial Capital Corp.*, 612 F. Supp. 2d 1080, 1082 (D. Ariz. 2009) (same). A mere decision not to respond following notice will only be deemed intentional if the party is "legally sophisticated." *Mesle*, 615 F.3d at 1093.

To determine whether a party is "legally sophisticated," courts consider whether the party is familiar with the legal process or has consulted with counsel at the time of default. Compare *TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 699 n.6 (9th Cir. 2001) ("Absent some explanation . . . it is fair to expect that individuals who have previously been involved in litigation or have consulted with a lawyer appreciate the consequences of failing to answer and do so only if they see some advantage to themselves.") with *Mesle*, 615 F.3d at 1093 (finding party unsophisticated where he was not a lawyer and was "unrepresented at the time of default"). Courts have considered "the defaulting party's general familiarity with legal processes or consultation with lawyers at the time of default as pertinent to the determination whether the party's conduct in failing to respond to legal process was deliberate, willful, or in bad faith." *Clark v. Andover Securities*, 44 Fed. Appx. 228, 230 (9th Cir. 2002) (affirming default judgment where defense counsel received two copies of the summons and complaint via certified mail but still failed to defend in any way). If a party has previous experience with the litigation process, they are deemed to be sophisticated parties. *Martinez v. Auto Now Fin. Services Inc.*, CV-21-01155-PHX-JAT, 2022 WL 1395728, at *2 (D. Ariz. Apr. 18, 2022) "Clients are considered to have notice of all facts known to their lawyer-agent." *Clark*, 44 Fed. Appx. at 230 (quoting *Cmty. Dental Servs. v. Tani*, 282 F.3d 1164, 1168 (9th Cir. 2002)). This case is not like *Knoebber*, despite Defendants reliance on that case.In *Knoebber*, a recent widow was undergoing psychoactive medication treatment for clinically-diagnosed depression, selling her home, moving her young children from California to Florida, and had no familiarity with the legal system. *Knoebber*, 244 F.3d at 699.Unlike the distressed, unsophisticated widow *Knoebber*, Alissa is legally sophisticated because she is a familiar repeat-player in U.S. legal proceedings from her prior lawsuits against Schuyler Moore, Ismael Corpas Moreno, and OneWest Bank (*see* Section I(A)-(b), *supra*). Further, her

Singapore divorce counsel was aware of this lawsuit at the time she was personally served and when default was entered against her. *TCI Grp.*, 244 F.3d at 699 n.6; Ex. A at Exs. 16-17 thereto. Alissa does not explain how or why her Singapore counsel could appear for her and file documents in Singapore court in which this case was overtly referenced, but she could not appear in this case for almost two months thereafter. She must have been in contact with her Singapore counsel during that time because her counsel filed documents in Singapore—an act undertaken by a lawyer which a client must authorize. Alissa's declaration is not credible in this regard, and it fails to establish a lack of culpability based on her legal sophistication and engagement with counsel in Singapore.

Even if Alissa is not legally sophisticated, her appearance in the Singapore divorce case but not this case cannot be anything other than "a devious, deliberate, willful, or bad faith failure to respond" considering her contemporaneous knowledge of this lawsuit, at minimum through her agents and attorneys. *Mesle*, 615 F.3d at 1089, 1092. The Motion offers no valid explanation to the contrary.

Furthermore, the Motion fails to explain the Corporate Defendants' lack of culpability in any meaningful sense. Rather, it exclusively focuses on Alissa. *See* (Doc. 28 at 12:11-13:22). The Motion also fails to identify any nexus between Alissa's alleged lack of culpability and the Corporate Defendants, which are each separate legal persons that must be separately assessed in this context.

The entry of default against each Defendant cannot be set aside because it is undisputed that the Defendants had notice of this lawsuit long before they appeared, and before they were in default and engaged in culpable behavior.

   **B.** **<u>Defendants lack meritorious defenses.</u>**

The party seeking to set aside an entry of default "must present specific facts that would constitute a defense, [but] the burden on a party seeking to vacate a default judgment is not extraordinarily heavy." *Mesle*, 615 F.3d at 1094. The moving party must "allege sufficient facts that, if true, would constitute a defense." *Id.* The point of this element is to ensure the party seeking to set aside the default "is not frivolously attempting to delay an inevitable

13

imposition of judgment." *TCB Remarketing LLC v. Metro Auto Auction LLC*, CV-20-01826-PHX-MTM, 2021 WL 2865095, at *3 (D. Ariz. July 8, 2021) (citing *FOC Financial Ltd. Partnership v. Nat'l City Comm. Capital Corp*, 612 F. Supp. 2d 1080, 1084 (D. Ariz. 2009)). General or conclusory allegations that the defendant "*will* present evidence" or "*would be able to* establish the necessary facts to defend himself" are insufficient to warrant setting aside a default. *Lowery v. Barcklay*, CV-12-01625-PHX-RCB, 2014 WL 47349, at *7 (D. Ariz. Jan. 7, 2014) (emphasis in original).

The only evidence provided in support of the Motion is Alissa's self-serving declaration. There are no supporting documents attached. If there was any truth to Alissa's allegation that the payments were an irrevocable gift, there would be a shred of proof, such as documents or communications. There is none. And is noted in Section I *supra*, readily available public information dispels any credibility to the "dowry defense," even assuming the allegations in the Motion and Alissa's declaration are true.

Alternatively, Phong herein provides Ex. A at Exs. 2-12, showing, among other things, (1) that Phong accounted for the payments over time, (2) that Alissa referred to them as "our assets," (3) that Phong participated in inspections and title issues related to the Investment Properties, and (4) that Phong included the word "Investment" on various forms.

Furthermore, while Section IV(B) of the Motion outlines a few allegations from Alissa's Declaration, it never explains how those allegations pose credible defenses to Phong's claims. None of the elements of fraud, nor any other claim or possible defense, is ever mentioned, let alone analyzed. These are general or conclusory allegations not tied to the elements of claims and defenses, and therefore insufficient to describe potential defenses.

Alissa's flimsy declaration should not overcome the entry of default because the allegations therein cannot constitute a defense as to her, let alone the Corporate Defendants. Even if her false allegations could establish a defense, Motion fails to meaningfully analyze the elements of any defense.

### C. Plaintiff will be prejudiced by delays as Alissa retains illegitimate control over the Investment Properties.

The standard for whether there is prejudice to the non-defaulting party is whether his "ability to pursue his claim will be hindered." *FOC Fin. Ltd. P'ship*, 612 F. Supp. 2d at 1084 (internal citations omitted). There is no prejudice where the only harm is "delaying resolution of the case," or "being forced to litigate on the merits." *Id.*

Phong will be prejudiced by delays because Alissa continues to claim control over the Investment Properties. As she does, she can extract value from the Investment Properties by, for example, renting them or removing fixtures. She could also destroy portions of them to reduce their value before Phong obtains control over them. Additionally, Alissa contrived her fraud using various offshore accounts, where she can transfer Phong's cash. Phong's odds of collecting on his forthcoming judgment depend on the Investment Properties' value and tracing and recover his cash.. Alissa has established a history of sketchy transfers and ignoring duties to her creditors. *See* Section I(A), *supra*. The longer Alissa controls the Investment Properties, the more opportunities she will have to reduce or extract their value for her own gain. Furthermore, the loans Phong took out to invest in the Investment Properties continue to accrue interest until Phong obtains control of the Properties, sells them, and uses the proceeds to pay back these loans.

To remind the Court, Alissa appeared in the divorce case in Singapore at the same time she was served and failed to respond here. It stands to reason that she saw a tactical reason not to respond. Phong will be prejudiced if default is vacated and Alissa is permitted to continue her control over the Corporate Defendants and Investment Properties.

## IV. CONCLUSION

Defendants failed to timely respond and did not appear until late March although they unquestionably knew about this lawsuit since January and early February. Given their legal sophistication, and even otherwise, their failure to timely appear is intentional, confirming their culpability for purposes of setting aside default. But even if they were not, their proposed defense relies upon a sham declaration and Phong will be prejudiced by further damages

15

(income from rental properties and accrual of interest) and reduced opportunities to collect if default is set aside and their fraudulent behavior is allowed to perpetuate. For all of these reasons, the Court should deny the Motion as to each Defendant.

RESPECTFULLY SUBMITTED this 17th day of April 2024.

**ADMON LAW FIRM, PLLC**

By /s/ *Moshe Y. Admon*
   Moshe Y. Admon, Esq.

**MAY, POTENZA, BARAN & GILLESPIE, P.C.**

Devin Sreecharana, Esq.

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants:

Patrick Emerson McCormick
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One South Church Avenue, Suite 2000
Tucson, Arizona 85701
PMcCormick@lewisroca.com

Eric Levinrad*
Amy S. Russell*
ERVIN COHEN & JESSUP LLP
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
elevinrad@ecjlaw.com
arussell@ecjlaw.com
*Pro Hac Vice Applications Forthcoming
Attorneys for Defendants Alissa
Chiaravanond, Pacific Shangrila LLC,
Cathedral Shangrila LLC, Nido di Stelle LLC,
and ILU LLC

/s/ Elena Cordero