Devin Sreecharana, Esq. (029057)
Trevor J. Wainfeld, Esq. (037146)
MAY, POTENZA, BARAN & GILLESPIE, P.C.
1850 N. Central Ave., Suite 1600
Phoenix, Arizona 85021
Telephone: (602) 252-1900
Facsimile: (602) 252-1114
Email: devin@maypotenza.com
twainfeld@maypotenza.com

Moshe Y. Admon, Esq. (034169)
Admon Law Firm, PLLC
300 Lenora St., #4008
Seattle, Washington 98121
Telephone: (206) 627-0909
Email: jeff@admonlaw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Phong Thanh Huynh,

Plaintiff,

v.

Alissa Chiaravanond, an individual resident of Arizona, Pacific Shangrila LLC, a Nevada limited liability company, Cathedral Shangrila LLC, a Nevada limited liability company, Nido di Stelle LLC, a Nevada limited liability company, ILU LLC, an Arizona limited liability company,

Defendants.

Case No.: CV-23-08622-PCT-JJT

**PLAINTIFF'S RENEWED MOTION TO MODIFY RECEIVERSHIP ORDER BY ADDING CATHEDRAL SHANGRILA LLC AND NIDO DI STELLE LLC TO THE RECEIVERSHIP ESTATE**

(Assigned to the Hon. John J. Tuchi)

**(Oral Argument Requested)**

Defendants have, again, mismanaged the Sedona Properties. The property taxes on all three Sedona Properties became delinquent. **Exhibit A**, Declaration of Trevor J. Wainfeld ("Wainfeld Decl.") ¶¶ 6-8, Exs. 3-5. The HOA for Sedona House 2 and the Sedona Land has filed two actions to collect on unpaid assessments since 2025. *Id.* ¶ 10, Ex. 7). And the HOA

for Sedona House 2 contends that property is in disrepair *Id.* ¶ 9, Ex. 6. At least some of these issues are like those that gave rise to Plaintiff's prior Motion to Modify Receivership (Doc. 78) ("2025 Motion to Modify").[1] *See e.g.*, (Doc. 78 at 5:17–6:9) (failing to respond to Sedona.org, the entity who manages a rental at Sedona House 1, concerning maintenance items; (*id.* at 6:10-14) (failing to pay HOA assessments for Sedona House 2 for long enough that the HOA was preparing to record a lien and foreclose).

All this occurred despite the purported assistance of their "property manager," MCA Financial Group, LLC ("MCA"), whose professional services Defendants touted as a fail-safe to their previous failures to diligently manage and preserve the Sedona Properties.

Indeed, the Court "hinged its denial of the [2025 Motion to Modify] solely on this third *Canada Life* factor of lack of immediate danger of loss, diminishment of value, or squandered." **Exhibit B**, Tr. of Proceedings, May 8, 2025 at 45:20-23 ("5/8/25 Tr."). The Court indicated that Defendants' retention of MCA to manage the Sedona Properties gave it "a fair amount of comfort … from the risk that controls this one [*Canada Life*] factor," in part because of the Court's expectation that a professional management company would "at least have a track record professionally" and would not "let things slide." *Id.* at 43:25-44:9. Unfortunately, that has not been the case.

As before MCA's engagement, Plaintiff independently discovered these current issues and brought them to MCA's and Defendants' attention. At its October 27, 2026 deposition**,** ***MCA testified it was unaware that the Sedona Properties were under such risky conditions*** because it had not (1) investigated those Properties' public property tax records since late 2025, (2) communicated with any of the Properties' HOAs directly at any time, (3) entered Sedona House 2 to assess its condition at any time, or (4) visited the Sedona Land at any time. *See* **Exhibit C**, a true and correct copy of the certified transcript of Rule 30(b)(6) Dep. of MCA, October 27, 2026 ("MCA Dep.") at 62:24-64:4, 76:21-24, 78:10-13, 184:10-189:20, 197:21-204:15.

---

[1] Capitalized terms have the same definition as the 2025 Motion to Modify except as otherwise defined herein.

Because MCA was unaware of these conditions, it did not identify them in its relevant monthly, Court-ordered reports. Such omission violates the Court's order to Defendant Chiaravanond to direct MCA to report monthly "that all insurance, property tax, association fees, and utilities are current and that all noncosmetic maintenance issues are being addressed." Ex. B, 5/8/25 Tr. at 45:7-13. *See also* (Doc. 108). Because Defendants indisputably failed to provide reports "demonstrating the currency of these obligations," through this Motion, Plaintiff accepts the Court's invitation to "immediately renew his [2025 Motion to Modify]." *Id.* at 45:16-24.

Addressing Plaintiff's then stated concerns, the Court aptly recognized that "[t]here's a danger of reactivity." Ex. B, 5/8/25 Tr. at 43:12-17. That danger clearly remains. Accordingly, the Court should give effect to its warning to Defendants that if MCA failed to accurately report on the Sedona Properties' liabilities and noncosmetic maintenance issues, the Court "will summarily grant th[is] [renewed] [M]otion." *Id.* at 45:16-24. Plaintiff respectfully requests the Court expand the Receivership Estate to include Defendants Cathedral Shangrila LLC ("<u>Cathedral</u>") and Nido di Stelle LLC ("<u>Nido</u>") and their assets, including the Sedona Properties, and include additional safeguards and reimbursement to the Receivership Estate and Plaintiff as identified in the contemporaneously filed proposed order.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I. <u>RELEVANT FACTUAL AND PROCEDURAL BACKGROUND</u>

### A. <u>The 2025 Motion to Modify</u>

On February 14, 2025, Plaintiff filed the 2025 Motion to Modify because he discovered that Defendants serially mismanaged the Investment Properties by (1) allowing fire insurance to lapse before the January 2025 Malibu fire destroyed the Malibu House (Doc. 78 at 2:5-26), (2) lacking knowledge of the status or identity of other key information about the Investment Properties (*id.* at 3:2-15), (3) failing to respond to Sedona.org, the entity who manages the rental of Sedona House 1, concerning maintenance items (*id.* at 5:17–6:9), and (4) failing to pay HOA assessments for Sedona House 2 for long enough that the HOA was preparing to record a lien and foreclose (*id.* at 6:10-14). Plaintiff then supplemented the record when he

learned that the Sedona Houses lacked insurance policies. (Doc. 80). At the May 8, 2025 hearing on the 2025 Motion to Modify, Plaintiff added that public tax records showed approximately $39,000 in unpaid property tax. Ex. B, 5/8/25 Tr. at 12:12-24.

In response to the 2025 Motion to Modify, Defendants argued that "Receivership over the Sedona Properties would be deeply harmful to Chiaravanond" because, relying on her February 28, 2025 Declaration (Doc. 85-1), "[i]t would be highly upsetting for her—or for anyone in her position—for that property to be accessed by anyone, including a court-appointed receiver or their representatives." (Doc. 85 at 8:5-23). *See also* (Doc. 85-1 at ¶ 4). Notably, through discovery, Plaintiff learned that Defendant Chiaravanond discussed listing Sedona House 2 (95 Cross Creek Circle) with a rental management company in Sedona in mid-April 2025, six weeks after she signed that Declaration (Doc. 85-1) and before the May 8, 2025 hearing on the 2025 Motion to Modify. Ex. A, Wainfeld Decl., ¶¶ 11–12, Exs. 8-9 (CL183652–183658). She did not tell MCA that she had considered listing Cross Creek. Ex. C, MCA Dep. at 180:4-17.

Defendants also focused on their contention that MCA's professional assistance with preserving the Sedona Properties would eliminate "imminent danger" thereto (Doc. 85 at 6:7-22). The Court later gave great weight to that point.

The Court granted in part and denied in part the 2025 Motion to Modify. (Doc. 108), "hing[ing] its denial . . . solely on this third *Canada Life* factor." Ex. B, 5/8/25 Tr. at 45:20-24. *See also* (Doc. 85 at 6:7-21). In so doing, it concluded that MCA adequately mitigated the risk of "immediate danger of loss, diminishment of value, or squandered." Ex. B, 5/8/25 Tr. at 45:20-23. The Court ordered that "beginning on June 1, 2025, Defendants shall file monthly reports prepared by the Sedona Properties' manager or other appropriate third party detailing the status of the elements enumerated by the Court on the record." The Court enumerated these elements on the record: "that all insurance, property tax, association fees, and utilities *are current* and that all noncosmetic maintenance issues *are being addressed*." Ex. B, 5/8/25 Tr. at 45:7-13 (emphasis added).

As relevant to this Motion, the Court confirmed that "if the defendant fails to timely

provide, each month during the pendency of this litigation, that [MCA] report demonstrating the currency of these obligations on the Sedona [P]roperties, plaintiff may immediately renew his motion to expand the receivership" and "the court will summarily grant the motion." *Id.* at 45:16-24.Defendants subsequently filed reports for MCA each month. (Docs. 112, 119, 125, 131, 132, 139, 145, 149, 155, 163, 176, 177, 188, 200, 206, 209, 213, 215, 216). Until October 2026, because he trusted MCA's reporting was accurate and thorough, Plaintiff had no reason to believe that the Sedona Properties were exposed to financial liability or not being maintained. Discovery, including MCA's representative's testimony, reveals otherwise.

### B. <u>Defendants' heavy redactions to MCA's subpoena response to preserve purported attorney work product</u>

On September 17, 2026, Plaintiff delivered a Notice of Intent to Serve Subpoena to Produce on Defendants. Ex. A, Wainfeld Decl. ¶ 4, Ex. 1. On or about September 23, Defendants' counsel accepted service of that Subpoena on MCA's behalf, generally reserved objections, and requested an extension for MCA to respond from October 5th to October 9th. <u>*Id.*</u> ¶ 5, Ex. 2. Plaintiff declined the extension because of Defendants' then-impending depositions (October 8 and 9). *Id.* On October 6, Defendants produced documents they received from MCA with redactions that, according to a cover email from Defendants, are based on the work-product doctrine and PII, though Defendants have not supplied a privilege log.[2] *See* Fed. R. Civ. P. 26(b)(5)(A). Defendants had not previously asserted work-product protection nor said they would redact MCA's documents accordingly, surprising Plaintiff two days before Defendants' depositions.

This harkens back to Plaintiff's counsel's prior stated concern about the effect of MCA's retention on transparency relating to the Sedona Properties:

> My point only was that when we talk about transparency going forward, how do we get that from a third party, effective, private receiver? . . . There's not going to be transparency.

---

[2] Plaintiff disputes the assertion of work product but has not filed a notice of discovery dispute seeking an order for unredacted documents to date. Plaintiff continues to discuss the issue with Defendants but is identifying the issue here because it is relevant to the relationship between Defendants and MCA, and thus relevant to this Motion.

> There's going to be what we're fed and what we're able to get through discovery. That's going to be a challenge and it, as I mentioned, has already been a challenge.

Ex. B., 5/8/25 Tr. at 36:1-8.

### C. <u>MCA's illuminating deposition testimony</u>

Plaintiff then deposed MCA on October 27. MCA confirmed it neither reviewed nor approved the specific redactions Defendants applied to its documents. Ex. C, MCA Dep. at 26:5-27:14 (MCA said it discussed redactions with Defendants "generally"). These documents demonstrate exchanges of report drafts between Defendants and MCA, though redactions cloak the content of those drafts, and MCA confirmed Defendants provided comments, suggestions, and redlines. *Id.* at 216:25-217:9.

Defendants and MCA produced the Consulting Agreement between MCA and Defendant Chiaravanond in response to the subpoena to MCA. Ex. A, Wainfeld Decl. ¶ 13, Ex. 10; *see also* Doc. 85-1 at 22–25. MCA and Defendant Chiaravanond are the only parties to that agreement. Ex. A, Wainfeld Decl. ¶ 13, Ex. 10. Cathedral, Nido, and Defendants' counsel are not. *Id.* Notably, Paragraph 7 of the Consulting Agreement provides MCA "will not independently conduct a due diligence review of Client and will, to a great extent, be relying upon information provided by Client." *Id.*

In May 2025, MCA reported the 2024 taxes past due on both Sedona houses and relayed Defendants' "goal" to pay them by the end of 2025. (Doc. 119-1 at 8). In December 2025, MCA reported that the 2024 and first-half 2025 taxes had been paid and that "[t]he second half of 2025 property taxes are not due until May 1, 2026." (Doc. 155-1 at 6). Based on this reporting, Plaintiff believed that MCA and Defendants were monitoring and paying property taxes related to the Sedona Properties, but it appears that MCA stopped doing so at the end of 2025. At deposition, MCA confirmed that it did not know if the second half 2025 property taxes due on May 1, 2026 had been paid. Ex. C, MCA Dep. at 185:15-186:1. MCA was also unaware if any other property taxes were due because it had not checked publicly-available records via the Yavapai County Treasurer's website. *Id.* at 186:2-189:20; *see also*

Ex. A, Wainfeld Decl. Exs. 3-5.[3]

MCA also reported that HOA assessments were paid. (Doc. 132-1 at 7) (referencing "HOA Fees"). Plaintiff had no reason to believe that MCA and Defendants were not ensuring that HOA assessments to all relevant HOAs were paid thereafter. However, on October 16, 2026, counsel for Cross Creek Ranch Community Association (the "HOA") wrote to the Receiver, referencing the receivership in this case, that the HOA has "two properties in collections for Nido Di Stelle," 95 Ravens Call Place and 95 Cross Creek Circle. Ex. A, Wainfeld Decl. Ex. 7. On October 26, 2026, the HOA's treasurer wrote that the HOA has not "received the required assessments and water-related fees on these properties since early 2025," and that "the residence located at 95 Cross Creek Circle is in a state of disrepair." *Id.* at Ex. 6. On November 3, 2026, Plaintiff obtained from the HOA's counsel demand letters, statements, and Complaints it had sent to Defendants but that had never been provided to MCA. *Id.* at ¶ 11, Ex. 7. Those documents show that notices were being sent to a house—2457 Angelo Dr., Los Angeles, CA 90077 (the "Angelo Property"), which Defendant Chiaravanond sold in 2025 [redacted]. **Exhibit D**, a true and correct copy of the certified transcript of Dep. of Alissa Chiaravanond, October 8, 2026 ("AC Dep."), Vol. 1, at 148:12–149:18.[4] The HOA also sent the notices to Sedona House 2 and Nido's registered agent. But MCA never requested notices directly from that HOA and Chiaravanond did not supply any to MCA, so MCA was unaware of the HOA's debt collection efforts. Sedona

---

[3] As of this Motion's filing, the property taxes show as still due. *See* https://taxinquiry.yavapaiaz.gov/Parcel/TaxSummary?parcelnumber=40813001J3, last accessed Nov. 13, 2026 (Sedona House 1); https://taxinquiry.yavapaiaz.gov/Parcel/TaxSummary?parcelnumber=4081908209, last accessed Nov. 13, 2026 (Sedona Land); https://taxinquiry.yavapaiaz.gov/Parcel/TaxSummary?parcelnumber=4081907705, last accessed Nov. 13, 2026 (Sedona House 2).

[4] Chiaravanond testified [redacted]

House 2's alleged state of disrepair remains unclear to Plaintiff.

At MCA's deposition, it confirmed that Keith Bierman had never personally been to any of the three Sedona Properties, no one from MCA has been inside Sedona House 2 at any time during its engagement, and no one from MCA had ever set foot on the Sedona Land. Ex. C, MCA Dep. at 62:24-63:20, 66:1-7, 76:21-77:9, 78:10-13. It also confirmed that it lacks direct access to the bank account that receives revenue from the rental of Sedona House 1, which is in Defendant Chiaravanond's personal name. *Id.* at 162:24-163:12, 166:7-15. MCA is not a signor on that account and receives only monthly statements that come by mail directly from Chase Bank. *Id.* at 154:3-8, 164:4-12. Given MCA's reliance on Defendant Chiaravanond for information, both contractually and as a course of dealing, it is highly concerning that MCA testified it cannot say how many times it has communicated with her directly since December 2025, and recalls only a voicemail from her about wildfire risk and one failed attempt to reach her. *Id.* at 102:2-103:3; *see also id.* at 17:1-10, 150:11-22, 176:6-10.

Given the Sedona Properties' condition when MCA was engaged, it is unsurprising that liabilities have again gone unpaid and unnoticed while Defendant Chiaravanond has been absent and unreachable. Defendants again failed to take action necessary to preserve the Sedona Properties' value, despite their retention of MCA. They continue to be reactive to basic property ownership and management issues, leaving the Sedona Properties at risk. *See* Ex. B, 5/8/25 Tr. at 43:5–7. The Receivership Estate should be expanded to avoid further loss to the multi-million-dollar properties at stake in this litigation under Defendants' watch.

## II. <u>ARGUMENT</u>

As the Court previously recognized, it has jurisdiction and discretion to appoint a receiver upon considering various factors. (Doc. 70 at 2:24–3:9) (citing Fed. R. Civ. P. 66; *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 843-45 (9th Cir. 2009)). The Court's power "to determine the appropriate action to be taken in the administration of the receivership is extremely broad," *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986), and includes deciding what property belongs in the estate. *SEC v. Capital Consultants, LLC*, 397

F.3d 733, 738 (9th Cir. 2005); *see also id.* at 750 (upholding treatment of three parcels the receivership defendant controlled, though titled in a client's name, as receivership property).

The Court's prior analysis of *Canada Life* factors 1, 2, and 4-7 (Doc. 70 at 3:20-4:11), and as Plaintiff analyzed in his 2025 Motion to Modify (Doc. 78 at 8-14, § II), equally apply here to Cathedral and Nido. Plaintiff only specifically addresses the third *Canada Life* factor here given the Court's ruling on his 2025 Motion to Modify. (Doc. 108); Ex. B., 5/8/25 Tr. at 45:16-24 Defendants' and MCA's demonstrable failure to safeguard the Sedona Properties' condition and value now satisfies the third *Canada Life* factor.

Because Defendants have not paid any property tax in 2026, $23,350.87 in 2025 taxes are delinquent and accruing interest, with another $44,933.70 billed for 2026. Ex. A, Wainfeld Decl. Exs. 3–5. Additionally, the HOA sued Defendants and notified Defendants of its intent to lien Sedona House 2 and the Sedona Land in June 2026 because of amounts due to the HOA. *Id.* at Ex. 7.[5] The HOA's treasurer reports Sedona House 2 (Defendant Chiaravanond's purported residence) is "in a state of disrepair," though Plaintiff lacks knowledge as to the extent of the alleged disrepair or the Sedona Properties' condition, generally. *Id.* at Ex. 6. Plaintiff does not know what other liabilities exist, whether Sedona House 2's current condition could allow an insurer to void a policy or deny coverage, or whether anyone is using the Sedona Land or any portion of the land Sedona House 2 sits on for a dangerous or unlawful purpose. The Court acknowledged the danger of such uncertainty and reactivity as a consequence of Defendants' mismanagement. *See* Ex. B, 5/8/25 Tr. at 43:12–17 (The Court explained "[t]here's a danger of reactivity" because, among other reasons "what if we discover tomorrow that one of the properties that isn't being supervised has a meth lab in it that's been run by a gang in Prescott or Sedona for the last couple of weeks and the whole place catches on fire or is just a hazard.").

Significantly, there is no evidence that MCA has personal knowledge of the Sedona

---

[5] The HOA's attorney informed undersigned that MCA had contacted the HOA regarding payment after MCA's deposition, but neither Defendants nor MCA nor the HOA have confirmed any payments to the HOA. *Id.*

Properties' condition or existing or impending liabilities. *See* Section I(C), *supra* (citing MCA deposition testimony). Defendants have been managing the Sedona Properties on their own, regardless of MCA's engagement, resulting in avoidable mistakes that are causing material risk to the Sedona Properties' physical condition and legal status. This contradicts Defendants' prior representation to the Court about MCA's role.

Defendants asked the Court to rely on MCA as a professional who would assist in preserving and protecting the Sedona Properties. The Court took comfort from "the property management company who . . . at least have a track record professionally and don't let things slide." Ex. B, 5/8/25 Tr. at 44:3-5. But neither the Plaintiff nor the Court knew at that time that MCA would just be an extension of Defendants who would not proactively or independently act. By agreement, MCA relies on Defendants (including through counsel) to provide material information to MCA about the Sedona Properties. Ex. A, Wainfeld Decl. ¶ 13, Ex. 10. MCA holds no license from the Arizona Department of Real Estate. Ex. C, MCA Dep. at 10:6-8. Arizona requires a license to manage property for others and regulates how a licensed manager accounts for owner funds and reports to the owner. *See* A.R.S. §§ 32-2122(B), 32-2173 to -2175. Whether or not the statute reaches MCA's engagement here, that lack of licensure highlights MCA's failure to take basic action to preserve the value of the Sedona Properties like confirming property tax obligations through public records and communicating with the HOA. MCA, and by extension Defendants, failed at the simplest tasks, and it is not the source of comfort Defendants presented in response to the 2025 Motion to Modify.

As far is Plaintiff is aware, Defendant Chiaravanond has lived in Sedona House 2, which is owned by Nido, rent free since February 2025. At the same time, she has personally received revenue from the rental of Sedona House 1, which is owned by Cathedral. The Receiver can redirect that rent to the Receivership Estate, and the Ninth Circuit has affirmed an order requiring a defendant to turn rents over to a receiver as "aimed at preventing further waste" and "a valid exercise of the district court's discretion in administering and supervising the receivership." *Canada Life*, 563 F.3d at 846. The Receiver should also be empowered to

seek revenue rightly held by Cathedral that was inexplicably transferred to Defendant Chiaravanond, who should not be personally receiving revenue from Sedona.org for the rental of Sedona House 1. And, if she will continue to live at Sedona House 2, the Receiver should be expressly permitted to collect a reasonable amount of monthly rent from her that it can use to pay expenses associated with the Investment Properties, including to monitor and fix any disrepair she continues to cause to Sedona House 2. It would be inequitable for her to continue to live at that property rent free, without paying its property taxes, HOA assessments, or maintenance to avoid a state of disrepair, and all while holding revenue that is not hers.

Further, in equity, Defendant Chiaravanond should be ordered to pay all outstanding amounts due to the HOA and to the County for outstanding property taxes. If the Receiver discovers any other past-due payments or existing liabilities, she ought to pay those too. She committed to maintaining the Sedona Properties in response to the 2025 Motion to Modify, apparently has the funds to do so, and the past-due balances are problems of her creation. Ex. D, AC Dep. Vol. 1 at 148:12–149:18 [redacted]. The Court may "determine who shall be charged with the costs of the receivership," *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994); *SEC v. Elliott*, 953 F.2d 1560, 1576 (11th Cir. 1992).

The balance of equities tips sharply in favor of expanding the Receivership Estate to include Cathedral and Nido. This Court should exercise its broad discretion to expand the Receivership Estate to protect the Sedona Properties and Plaintiff's alleged interest therein, particularly given the grace and related admonition previously given to Defendants. *See* Ex. B, 5/8/25 Tr. at 39:24–40:21, and 45:16-24. The Receiver can independently evaluate the assets held by those entities, collect revenue that is currently being paid directly to Defendant Chiaravanond personally, and not only preserve but enhance the value of the luxury residential real estate at issue in this litigation.

## III. <u>CONCLUSION</u>

Defendants and MCA took no proactive steps to discover, address, or resolve the above-described property and legal conditions that plague the Sedona Properties. Plaintiff had

to investigate and identify them. Defendants'—and now, MCA's—endemic reactivity continues to put the Sedona Properties in danger. An independent receiver is necessary to protect the Sedona Properties' value for the benefit of the prevailing party, whoever that may be. Defendants have clearly demonstrated their unwillingness or inability to do so.

Plaintiff respectfully requests the Court summarily grant this Motion, thereby modifying the Receivership Order (Doc. 70) to include Cathedral and Nido as Receivership Companies so they and their assets, including the Sedona Properties, are added to the Receivership Estate

Additionally, given circumstances and procedural history giving rise to this Motion, Plaintiff seeks the entry of the following additional orders:[6]

(i) the Receiver is permitted to collect a reasonable amount of monthly rent from Defendant Chiaravanond for living at Sedona House 2;

(ii) Defendant Chiaravanond must pay all revenues that have been collected from the rental of Sedona House 1 since December 2, 2023 (Doc. 1) to the Receivership Estate; and

(iii) Defendant Chiaravanond must pay all delinquent property taxes, penalties, and association assessments, fees, and other currently- and past-due expenses on the Sedona properties, and the cost of the repairs the Receiver identifies as reasonably necessary to protect and preserve the Sedona Properties.

Plaintiff has contemporaneously filed a proposed order with this Motion.

[6] Plaintiff reserves the right to request an award of attorneys' fees and costs, including related to the issues in this Renewed Motion to Modify, later in this litigation.

RESPECTFULLY SUBMITTED this 13th day of November, 2026.

**MAY POTENZA BARAN & GILLESPIE, P.C.**

By *<u>/s/ Trevor J. Wainfeld</u>*
Devin Sreecharana, Esq.
Trevor J. Wainfeld, Esq.

ADMON LAW FIRM, PLLC
Moshe Y. Admon
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Matthew Hersh
THE LAW OFFICE OF MATTHEW HERSH
3214 Newark Street NW
Washington, DC 20008
matt@matthewhersh.com
*Attorneys for Defendants Alissa Chiaravanond, Pacific Shangrila LLC, Cathedral Shangrila LLC, Nido di Stelle LLC, and ILU LLC*

Adam Bennett Nach
Stuart Rodgers
NACH, RODGERS, HILKERT & SANTILLI
2001 E. Campbell Avenue, Suite 103
Phoenix, Arizona 85016
docket@nrhslaw.com
adam.nach@lane-nach.com
stuart.rodgers@nrhslaw.com
*Attorneys for Peak Performance Restructuring Services, LLC*

*/s/ Elena Cordero*