# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

| | | |
|---|---|---|
| Phong Thanh Huynh, | ) | |
| | ) | No. 3:23-cv-08622-JJT |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | May 8, 2025 |
| Alissa Chiaravanond, et al., | ) | 1:31 p.m. |
| | ) | |
| Defendants. | ) | |
| | ) | |

BEFORE: THE HONORABLE JOHN J. TUCHI, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Motions Hearing)

Official Court Reporter:
Scott M. Coniam, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

For the Plaintiff:

May, Potenza, Baran & Gillespie, P.C.
By: Mr. Devin Sreecharana, Esq.
Mr. Trevor J. Wainfeld, Esq. (Telephonically)
1850 N. Central Avenue, Suite 1600
Phoenix, Arizona 85021

Admon Law Firm, PLLC
By: Mr. Moshe Y. Admon, Esq. (Telephonically)
300 Lenora Street, #4008
Seattle, Washington 98121

For the Defendant:

Mestaz Law
By: Mr. Matthew Hersh, Esq.
5090 North 40th Street
Phoenix, Arizona 85018

P R O C E E D I N G S

(Proceedings convened at 1:31 p.m.)

THE COURTROOM DEPUTY: This is civil case 23-8622, Phong Thanh Huynh vs. Alissa Chiaravanond. This is the time set for motion hearing.

Counsel, please announce.

MR. SREECHARANA: Thank you.

Devin Sreecharana on behalf of the plaintiff. And joining telephonically is Trevor Wainfeld and Moshe Admon.

THE COURT: All right. Mr. Sreecharana, good afternoon.

MR. SREECHARANA: Good afternoon, Your Honor.

MR. HERSH: Matthew Hersh on behalf of the defendants.

THE COURT: Mr. Hersh, welcome. Good afternoon.

Counsel, I have read everything you submitted. So we will be addressing, and the court is now very familiar with, the motion to modify the receivership I found at Docket 78, the response and the reply thereto and all of their attachments.

Then the first motion to supplement, which is plaintiff's motion to supplement that I have down at Docket 80. Defendants' first motion to supplement at 92. And then more recently second motion to supplement at 107. And then there were also -- at least for one round of the motions to supplement there was an objection and a reply. I think it was for the defendants' first.

So I'm prepared to hear you on the entirety of this unitary matter. You can start with whatever comfort you derive from this court's representation that it is now familiar with all of the arguments that you've laid forth in the documents to a fair detail and that I will ask you questions where they are material and where I believe my understanding has gaps.

But beyond that, I'm going to treat this in the standard motion practice and start with movant.

Mr. Sreecharana, you have free rein to lay out, in as much or little detail as you want, the argument supporting what you've already given me on the motion practice.

Then I will hear from you, Mr. Hersh.

And because the movant has the burden, I'll give you the last word, Mr. Sreecharana.

And I will try not to ask questions while you are giving me these presentations and save them for the end, but I can't make any guarantees.

MR. SREECHARANA: Thank you, Your Honor. And it's fine if you interrupt me. I'd prefer a dialogue.

Just to be clear, on the motions to supplement, those are not -- have not yet been ruled upon, so I'm prepared to address them and I'm also prepared to address the evidence that was attached to them.

THE COURT: Treat them -- I guess the way I want you to treat them is -- and I laid out in the first instance that I

am familiar because I've gone ahead and read them and I don't think that there's anyway for me not to look at that before I got to tackling the issue of whether or not they should be permitted. In other words, I needed to know the what before I could decide and so I have that familiarity and just let's handle it all unitarily.

MR. SREECHARANA: Okay. Thank you, Your Honor.

As the court is familiar, the crux of this case is really about who owns these properties through the LLCs that were formed. My client says that this was part of a misrepresentation by defendant Chiaravanond about assisting him preparing a retirement nest egg through which he would get rental income and because of the personal relationship that they had first as colleagues and then as a married couple and ultimately her experience investing in the United States as she told him, he invested over $15 million in these properties in the form of cash consideration to purchase them and also to maintain and preserve them.

Defendants and specifically Ms. Chiaravanond contend that it was all a gift. That is the crux of the case, who owns the properties.

And I should note that from the moment that we became familiar -- or my client became familiar with defendants' position that these were theirs -- or hers alone, there has been notable issues with the Sedona properties in particular.

And I know the court's aware about the Malibu properties and there's some interrelationship, but I'm focusing only on Sedona.

There has been issues with vendor nonpayment. There's been issues with delinquent HOA fees. At one point there was an HOA lien on the property -- on one of the properties. The properties were in disrepair so much so that they were taken off the rental market, which was the primary purpose for the investment. There was radio silence, as the court knows, from the defendants not only in this case but leading up to this case so much so that vendors could not get ahold of her and ultimately were advancing costs or paying things to keep the properties in repair.

Following what happened in Malibu, which was obviously a travesty, we turned our attention to the Sedona properties, particularly once Mr. Hersh and his firm got involved, because there was someone we could actually talk to and we learned about the lack of insurance on the California properties. We also learned about the lack of insurance on the Sedona properties, which was an open question at the time we had filed our motion.

We'll talk about the insurance a little bit later, but the point was that all of the issues that predated this motion with regard to the Sedona properties existed at the time and then it became clear that they were also uninsured. And faced

with the multimillion dollar loss that my client had just incurred in Malibu, it was untenable to let that happen again.

In response, what defendants have effectively tried to do is privatize a receivership. They've hired effectively a receiver who they're paying privately and I'll address that. They've also hired a corporate lawyer to help with some type of corporate issues of which are vague and probably intentionally vague because of privilege issues.

But the fact of the matter is it really underscores a theme in this case. The theme is that there's reflexive action on the part of defendants instead of proactive action. And it's the proactive action that's important to protect and preserve these investment properties no matter who the fact finder ultimately determines who owns them.

And we've seen the loss -- the catastrophic loss already and we've seen mismanagement of the Sedona properties at least as of the time of the filing of the motion and I'd like to address a couple of other instances.

But going back to this issue, it's been persuasive in the case not only with regard to the properties but the management. We identified issues; they react. And it's constantly a game of Whack-a-Mole. It's unfair. It's prejudicial. And it puts us in a position as the plaintiffs to identify issues, being diligent and vigilant, while they're really claiming that they are the title holders and responsible

for these properties.

I would submit to the court that all of the factors -- the Canada Life factors militate in favor of expanding the receivership.

And I'm not going to belabor each of the points that were raised in the briefing, but I want to address a few issues that maybe weren't addressed as clearly or that were addressed in the response that I think merit further consideration.

There is a question about whether or not there are valid claims that have been asserted. The court has already determined in the context of the first receivership motion that the claims are valid, maybe not that they're meritorious, but they were properly pled and based on that pleading and based on the evidence, there's a possibility that they could go forward and succeed.

There is -- with regard to the probability of fraudulent conduct, what I gleaned from the briefing is that the defendants are effectively taking the position that we must prove fraud.

We're early in the case, as this court knows -- and perhaps we're still -- we're still in its infancy. Even though this is a 2023 case, disclosure and discovery is effectively just underway. We're not in a position, nor are we required to prove fraud. We need to prove a probability of fraud, which is much less than the countervailing standard for permanent

injunction or a preliminary injunction, a substantial likelihood of success.

The fact is, as I said, there's evidence that there was $15 million transferred. There are several emails, bank statements, and bank transfers which demonstrate that the money came from my client and he was in the loop with third parties in the acquisition and protection of those properties early on predissolution of the marriage and he has nothing to show for it. It is unbelievable that someone would give a $15 million gift based on that paper trail. And the paper trail I'm referring to we had cited by -- incorporation by reference was Docket Entry 33-3, which was a prior declaration from my client.

One thing I noticed in the response was there was an argument that fraud should -- the alleged fraud should be tied to the imminent danger and we both cite competing cases on that. Ultimately, I think that's incorrect. I don't think there has to be a fraudulent act which leads then to the imminent danger. That would be impractical in a number of circumstances, particularly where there's an omission or some misrepresentation and the act of which leads to danger could be unknown to the person who's been injured. So I don't think that's correct. And the court has previously addressed those factors in the first application and I believe addressed them correctly.

With regard to the imminent danger, we have made no secret that there's literally no fire here at this time thankfully. The first time around was maybe your quintessential and perfect scenario but worst-case scenario for the context of a receivership.

The standard is not that there needs to be a bulldozer waiting outside or a fire that's about to happen. It's is there imminent danger? Is there imminent potential for diminishment in value? Could it be squandered? And here I think the answer is yes.

I've laid out what happened premotion as to the management or mismanagement of the Sedona properties.

Here's what happened after the defendants retained their professionals. They got one insurance policy by the time they filed their response. They subsequently got two insurance policies on the properties, none of which cover wildfire insurance. There is a vague reference by their -- I'll call it a property manager that fire coverage is generally hard to come by these days. There's no indication of whether or not it was actually applied for, why it lapsed, how it lapsed, when it lapsed, all of that. The only reference is we have some potential -- we have some potential services for fire defense which is like fire safe, we clear brushes, and things like that which ultimately could be terminated in a moment's notice.

THE COURT: Is it the plaintiff's position that if the

receivership were to be granted extension over the Sedona properties, that plaintiff -- I should say that the receiver would obtain fire insurance as against all of the Sedona properties?

MR. SREECHARANA: That's the plaintiff's position. And I would say the caveat would be use best efforts to do that.

I've not seen anything from the defendants as to what they have done to try and secure that type of coverage or how much it might cost, if it was cost prohibitive, but someone should be doing that because it is Northern Arizona and it is a very lucrative property and we're headed into the summertime.

The other thing I'd note is that in connection with the defendants' first motion to supplement, we identified our concern that even though plaintiff -- I'm sorry -- defendant now has professionals assisting her, that there are still gaps in their diligence. There was an HOA fee that was unpaid that was sent to my client and it was sent to my client because of the delinquent fee from 2024 when the HOA couldn't find Ms. Chiaravanond and somehow, underscoring the fact maybe that Mr. Phong has some interest in these properties, delivered the notice to him. So defendants did acknowledge that it was unpaid. They ultimately paid it. But it again evidences a reactive, reflexive conduct by them and it's at minimum misfeasance.

At all times Ms. Chiaravanond, even in this case when she had the Malibu properties under her control, had lawyers to help her. She now has two sets of lawyers and she has a property manager.

HOA fees I would put in the category of basic necessities or basic requirements for any property owner, insurance, HOA fees, property taxes, a mortgage if she had one but she doesn't because my client paid for everything in cash.

The ongoing failure to identify potential liabilities and address them before they occur is a problem, particularly where we and my client don't get notice of it.

The other issue -- and this is one that I've discussed briefly with Mr. Hersh. But in preparing for this argument, I considered whether or not there were any other potential liabilities to these properties. I searched the public records last night. I'll represent to the court in Yavapai County there are records, tax records, for these properties and there are approximately -- and I don't want to miss this -- there are approximately $39,000 in unpaid property tax. And these are public records. I did disclose them to Mr. Hersh yesterday when I discovered them. One for Sedona house one in the amount of 12,500. Another for Sedona house two in the amount of 26,700. And the Sedona land remarkably is paid current thankfully. But what I anticipate Mr. Hersh will say is that these will be taken care of and rightfully so, but why do I

need to address these each and every time and why do we -- and how do we rely on them to continue to do so without any transparency?

I'd like to just talk briefly about the absence of adequate legal remedies. This wasn't addressed at all in the response and the court has I think already properly acknowledged this in connection with the first motion that this involves the potential loss of unique property. It's ultimately the relief that we seek which is to take title to the properties or ultimately enjoy them could be lost, particularly if Ms. Chiaravanond disengages again as she has twice in this case.

I would also like to just address because it wasn't addressed fully in the response if it's not obvious to the court -- I'll address the nonobvious things to the court. The harm to my client is here. There are now two third parties that were involved in allegedly assisting with the management of this case. The property manager whose functions are unknown to us other than he's helping assist with the management of the Sedona properties, which one and how and to what extent and what he's doing is unclear.

And then there is a corporate law attorney that's assisting Ms. Chiaravanond to help with corporate governance and financial condition of the properties, which suggests to me that there was either a failure to file corporate formalities,

but in any event it's not information that we're going to have access to unless there's going to be a waiver of the privilege. So in this context, there's an impediment -- a further impediment to get information in a case where there have been impediments to get information.

I note that Ms. Chiaravanond is now living in Sedona house one. She was living in -- I'm sorry -- she was living in Malibu prior to it perishing. She does have -- and it's in her own declaration, she does have other options. And we're not suggesting, you know, that there be some forcible detainer or something like that. There's obviously ways to work around if she truly has nowhere to go. But the fact of the matter is if she's there in a property that was earmarked to be a rental property, there should be some consideration for being there and more importantly in the context here, a third party overseeing her presence on the premises.

Address one more factor, Your Honor. The -- it's a dual factor probability of success and the possibility of irreparable injury. Defendants, again, hearkening back to what I said earlier, seem to think that we must prove fraud and this all hinges on fraud. As the court is aware because of this unique relationship and really the circumstances that led to this case, there are a number of claims at issue. And there is a fraud claim and there are negligent misrepresentation claims but there's also equitable claims and quasi-contract claims

that if -- that we believe we do have a probable degree of success on and we can have probable success on any of them and they can support this factor.

I'd note, again, that what I referenced earlier at Docket Entry 33-3 at Exhibits 2, 3, and 4, these are bank transfer statements and wire transfer statements that clearly identify the transfer of significant sums of money as an investment. There are also some that demonstrate -- or, I'm sorry, that provide that they were for personal expenses.

The fact of the matter is there's an affidavit that makes clear that they were all intended for the purchase and maintenance of the properties and they're in the record.

There is no controverting evidence that none of these funds were not used to purchase these properties or maintain these properties.

And I'd also note there was a comment -- I think maybe more than a comment in the response about the plaintiff's failure to just meet a threshold evidentiary issue of whether or not this was -- there's testimony or evidence that this was for Mr. Phong's benefit. There are numerous documents that are authenticated in the record that demonstrate that. The court can also take notice of the pleadings themselves in the briefing. And I'd also note there is copy of the verified California complaint which largely mirrors this one, it's at Docket Entry 50-5, and there are a number of paragraphs, again,

similar to those in this case, that make clear that this was to be a retirement plan. Mr. Phong relied on Ms. Chiaravanond's representations, misrepresentations that they would be used for rentals and there would be clash flow for retirement. And just as a few examples, if the court's interested, it's at paragraphs 20, 26, and 100. So there are things in the record, contrary to what defendants have articulated, that support a probability of success and a possibility of irreparable injury.

The final thing I'd note is that obviously these are factors. This is a sliding scale. No one is dispositive. We think that all of them militate in favor of expanding the receivership, but even if one doesn't or one's a wash, given the history of Ms. Chiaravanond's mismanagement and misfeasance with regard to the properties, the amount at issue, the number of times we've been in front of this court in a very short period of time trying to get basic information about properties and investments, it makes sense, it makes good sense to preserve the status quo by having a neutral in place, even one that my client is willing to advance the costs for so that these properties can be properly maintained and preserved pending a merits decision on the claims and defenses in this case.

I'll note in closing -- and this is outside of the motion, but regarding the motions to supplement, from our perspective, our motion to supplement was not opposed.

Defendants noted that in their response and in, I think, footnote one.

We ultimately opposed the first defendants' motion because it appeared to be information that was or could have been available to them and it was submitted post-briefing.

Ultimately, though, when I look at that evidence or proposed evidence, it again supports this concept or the theme that there is reflexive action. These are things that should have been done far in advance of even the motion being filed but certainly before they filed the response.

I'd say the same with regard to their second motion. We did get the second motion last night around the close of business and, frankly, just didn't have the time to really meet and confer on that, but I told Mr. Hersh that I would oppose it on the same grounds because I don't think it should have taken that long to get that basic information, nor do I think that Ms. Chiaravanond should have missed that HOA payment in the first place.

I'm happy to address any of the court's questions.

THE COURT: I may have some at the end, Mr. Sreecharana, but I do have one right now. And it's a citation in your motion that you also referenced today and then the defense referenced in its response as well and that's to Docket Number 33-3. Docket 33 I believe was your response to -- on behalf of your client to the motion to set aside

previous. And I understood that. I reread that motion -- or that response in my preparations. But when I went to 33-3, I couldn't find the material that you were citing to me. You cited to me paragraphs 5 to 15 and 18 and so from that I assumed it was probably an affidavit. And there is a declaration or an affidavit, but it doesn't line up with that at all. And I don't think it's in -- well, it might be in 33-3. It's in one of the attachments.

In any event, I couldn't make it line up and so -- and the same point was made in the defense's response that they didn't think that it was responsive or that those -- that citation supported the proposition that you had put forward, which is Mr. Huynh had produced evidence supporting his claim that the investment properties were meant to be acquired for his sole benefit.

So when I am listening -- well, at some point today, I'd like you to line it up for me. I don't think that anybody has hallucinated, you know, a citation or made it up or anything. I just need to have somebody point me correctly to it so that I can read those paragraphs and understand the point. Okay.

MR. SREECHARANA: I will say this, Your Honor. I am at a disadvantage right now because I don't have my computer with me and I do not have that particular document.

I can say this. I know that that affidavit does

include reference to and amounts of the bank statements and the bank transfer statements and emails that I referenced during my presentation that show funds leaving my client's bank account and going --

THE COURT: So it was an affidavit by Mr. Huynh?

MR. SREECHARANA: It was.

THE COURT: Okay. So I did read one affidavit in 33-3 roughly but it went to the chronology of how much time Ms. Chiaravanond spent in that location where he tells me he recalls 120 days and it was -- that was really about whether or not there was a bankers box full of documents or not. It doesn't go to the issue of payments and purpose. And so I think there must be some other declaration.

MR. SREECHARANA: I don't want to misspeak. And I would say either if my colleagues can find that that are listening and text it or email it to me, I can maybe give some color there, otherwise I would have to consult after the hearing.

THE COURT: Go ahead.

MR. SREECHARANA: I will --

MR. HERSH: Got them right here.

MR. SREECHARANA: Okay.

MR. HERSH: I was planning to start talking about them actually.

MR. SREECHARANA: I can take a look at them or --

THE COURT: Mr. Hersh, if you would cooperate and hand those over for just a moment and, Mr. Sreecharana, if you can point me to the right ones, I'll look at it right now before we go on. How's that?

MR. SREECHARANA: And what I was -- what I want to say, though, to be clear, is this declaration does not say that it was for his sole benefit. It does reference the bank statements and the emails and the like that I was referencing.

THE COURT: I also, by the way, did see a very brief declaration that goes to the two bank statements that show the 1.9 million and then the 290,000 from the sister's Vancouver account I think but, again, that declaration wasn't long enough to have paragraphs 5 through 15 and 18, so there's got to be another one out there.

MR. SREECHARANA: Okay. I will take a look at this right now.

THE COURT: All right. Mr. Hersh, why don't we sit tight rather than having you have your eye on two things. We've got the time. We'll go ahead and suspend for a moment.

I'll be right back.

(Pause.)

THE COURT: I'm sorry. Please go ahead.

MR. SREECHARANA: I've completed my review, Your Honor.

THE COURT: All right. So back on the record.

What did you figure out, Mr. Sreecharana?

MR. SREECHARANA: So --

THE COURT: Where did I go wrong?

MR. SREECHARANA: I don't think you went wrong anywhere, Your Honor.

This is the declaration that I intended to cite to. This is the declaration that was cited in the response. It does include the bank statements and the email and the like that I was referencing.

If the question is where does it say -- or where in the exhibits does it say this is for my sole benefit, the answer is it does not.

THE COURT: Okay. Just so I'm on the same page, could you hand it up for a moment and tell me what I need to zero in on, whether it's just the first page or the first couple pages.

MR. SREECHARANA: So it's by Mr. Hersh's --

THE COURT: I promise, Mr. Hersh, you'll get all your papers back in the same order.

All right. So I'm at 33-3.

MR. SREECHARANA: It's the declaration and I think -- and you properly cited to the paragraphs earlier. Off the top of my head, I think they were 5 through 15 and 18 or something like that.

THE COURT: All right. Okay. These are, in fact, what I did look at and now with your explanation, which I'm

taking essentially as there is a muscular or perhaps aggressive argument being made as to what they stand for.

MR. SREECHARANA: I would agree with that characterization. And I'd also note, as I stated earlier, I think it was -- all the numbers straight -- but Docket 50-5 to the point of was this for Mr. Huynh's benefit, it's clearly in the record there.

THE COURT: All right. Thank you very much.

MR. SREECHARANA: Thank you, Your Honor. Thanks for your help.

THE COURT: One, I appreciate the cooperation between counsel. Two, this clears up my misunderstanding. I now see exactly how the citation applies and the question then is how do I interpret the information. I've got that.

All right. Mr. Hersh, again, like Mr. Sreecharana, you're welcome to address from the counsel table or from the lectern, however you're more comfortable.

MR. HERSH: Well, I have the table filled here, so if the court doesn't mind, I'll do it from here.

Well, Your Honor, I was about to start with that declaration as it happened which is why I had it out conveniently and I think counsel and I basically agree on the legal framework here. This is going to turn essentially on three Canada Life factors, the plaintiff's probable success in the action, whether the property is in imminent danger, and

whether there is fraudulent conduct, whatever that means, and we'll get to that.

I wanted to start with the question of probable success in the action because this is essentially a preliminary injunction hearing. It seeks something slightly different, but the same standard applies. This is essentially an evidentiary -- not an evidentiary hearing, but this is an evidentiary motion and the court is -- needs to eventually come to a conclusion based on the evidence that there is a probability or at least a reasonable likelihood that Mr. Huynh will prevail in this case.

And so what I spent some time this morning doing was actually going and taking a look and saying, all right, well, what is the sworn evidence that is actually in the record at this point having to do with the merits of this case?

And I could find only two. One was this document we were just talking about, Exhibit 33-3, which is plaintiff's declaration in support of the response to the motion to set aside the default and then there was the declaration that he made in connection with the motion to modify the receiver, which we talked about a bit.

There was one other declaration that didn't go to the motive -- that went to the homeowners association payment but not to the merits of the case.

And it's important I think, Your Honor, to put this in

context because I think a lot of the briefing from the other side has suggested that this is -- this case has to come out one way or the other. Either Mr. Huynh is going to convince the fact finder that he bought these properties as an investment for himself unrelated to the marital or future marital estate as simply as his or alternatively, our view, which is that -- Ms. Chiaravanond's view which is that this was all a dowry and that makes it hers, again, separate and apart from the marital estate.

Well, there's really a third option, Your Honor, which is that these properties, these funds were contributed to what was then anticipated to be and then eventually became the marital estate. And if that's, in fact, what a fact finder finds -- and we, of course, think the fact finder will eventually find that this was a dowry -- but if a fact finder ultimately concludes, no, this wasn't a dowry but you know what, this was just Mr. Huynh doing what a husband does if he has money, which is buying properties for the future marital estate, then what happens is their case fails and this goes to where it always should have been which is the family court, either in Singapore or here or perhaps somewhere else, to sort out how to divide up this marital estate.

So I think there's been a lot of burden shifting happening in this briefing. I think there's been a lot of references to, well, we haven't proved that this is a dowry or

we haven't proved that this wasn't an investment. Well, it's his burden to come up with enough evidence as of now to convince this court that this was at least reasonably likely an investment for his purposes only as opposed to a contribution to the marital estate.

And when I went through and I spent some time this morning going through this big thick declaration and everything that I saw was completely consistent with the notion of a spouse or future spouse making a contribution to the marital estate. There are documents saying that -- certainly there are bank statements saying there's money being transferred for an investment, no question. The couple was buying these properties in part as an investment. That's the -- that's how they were treating it. They intended to not live in all of them but to rent some of them out and earn money from them.

There's correspondence which the homeowners corporation and people doing repairs and information with brokers, those are all the kinds of things that if a husband were contributing property to a marital estate, he would be copied on all of those things.

There's correspondence with his lawyer talking about how, you know, we want to make sure our money and our property is protected. He refers to it repeatedly as ours.

There's just nothing here -- and I'll cite to one page. This is a lawyer -- correspondence with his attorney.

It's Document 33-3, page 48. And this is part of an email that Mr. Huynh sent to his attorney and it says -- and I'll just read: While my fiancée is a citizen has invested in real estate in the states before, I am totally unfamiliar being a Canadian citizen working in Asia. We just want to make sure we set things up properly to minimize tax leakage and also in a way that we can get leverage from these properties. We have so far paid cash for all of them.

Now, that's not somebody talking as if he's somebody investing $15 million for his sole benefit. That's somebody talking as if he -- as part of a relationship, as part of a soon-to-be marital estate is contributing to the benefit of the estate.

The same thing -- I won't belabor the point, but it's the same thing with the second declaration. This one's even more problematic because these are the funds that are supposed to have been transferred into this 2.7, $2.3 million fund for the upkeep of the property. These don't even say investment. They simply say personal expenses. So there's even less evidence here than there was with respect to the money for the property.

So I think in a sense the court could stop the analysis right here and I don't think it should, but it was their burden to get us to this point with evidence.

The other aspect of this -- of the issue of the

probability of success, Your Honor, is, you know, it's the old Sherlock Holmes aphorism of the dog that doesn't bark. If Mr. Huynh was investing $15 million of his own money for assets that he planned to own in the United States, then there is just a plethora of materials that he should have that would go along with making that investment. Start with just basic financials, P&Ls, balance sheets, valuation, budgets. This is a sophisticated investor who runs a multinational insurance firm. If he's investing $15 million, why is there not a shred of that in the record?

There's tax documents. Mr. Huynh supposedly has owned properties in the United States for the last several years. Has he not been paying taxes on them? Has he not made returns to the IRS, to the Arizona, to the California tax authorities?

There are so many other legal requirements. It's not easy to be an overseas citizen and buy property in the United States. This is actually the mysterious attorney that counsel was speaking of, well, she helped us put this together, Ms. Parsons, who happens to do this.

There is the Bank Secrecy Act which requires that anybody who's the beneficial holder of an account be disclosed with a foreign FinCEN form to that bank.

Now, if Mr. Huynh's right, he's been the beneficial holder for years of all these bank accounts that the LLC has had with Chase account. He's not at one point said, boy, we

ought to disclose I'm the holder of these things when the whole entire point of the Bank Secrecy Act -- of course it was a post-9-11 act so that banks would know who's the actual owner of the accounts.

I can go on and on. The Corporate Transparency Act. There's a requirement to file a beneficial ownership requirement. There's the investment -- International Investment and Trade and Services Surveys Act. If you're a foreign investor, you have to submit forms of the BE-13 series. All of these documents -- now, maybe they have them. We've asked for them in discovery. They're not due yet. Maybe they have them and they're holding onto them. But at this point if they're asking this court for preliminary relief, particularly relief as strong as a receivership, we should have those and the fact that we don't gives me -- I think it should give the court some very strong reason to think that they don't exist at all. So that's the merits of this case.

The second part of this, as we both mentioned, is the issue of imminent danger. Well, there's just not imminent danger. There's -- obviously there's no fire bearing down. The property is insured.

Let me start with this before I get too far in this. I have to be candid obviously. My client is not going to get any award for being the property manager of the year. She had a very difficult 2024 for personal and physical and health

reasons, but where she has come from the end of 2024 when she had property uninsured and was absent from this case to where she has come right now I think is very telling. We have worked very hard to get her connected with the experts who have been piece by piece getting these properties in order. We do have insurance. We took care of the HOA fees that we knew about. Wildfire insurance, we talked to our -- the expert who's been a receiver in hundreds of cases, he said you just can't get it. If counsel doubts that, I'm happy to have Mr. Nach -- I hope I'm pronouncing that name -- the current, receiver for the California properties -- he's welcome to call Keith, our expert, we'll get him on the phone tomorrow. If there's something we've missed, then by all means we'll patch that up.

The HOA fee that was missing, that was particularly interesting to me because apparently there were these two properties back to back and she was getting statements for one and not for the other. And they were going apparently to Mr. Huynh. I'm not sure why he let them -- they were apparently unpaid for months. I'm not sure why he just chose now to tell us. He could have had his counsel tell us four months ago and we could have taken care of that.

The taxes that counsel found last night, I told him it's a government record. I don't mind it being in the record or any of it being in the record. We're trying to figure out what the story is there. If there's something that needs to

be paid, we'll take care of that.

The bottom line here, though, is that there's no fire. There's no lien. There's nobody about to collect. There's nobody about to foreclose.

And there has been -- counsel mentioned this that there hasn't been transparency. Well, that's the one thing that I really do take a little bit of umbrage to because we have actually been as transparent as can possibly be. We've told them the moment we learned about insurance that it didn't exist. We told them the moment we learned that insurance had been acquired, we told them. We have been on the phone repeatedly with the court appointed receiver on the California properties. We've been speaking to them all the time. He has an open line to me and through me to my client. So we've been transparent. And if there's anything that we've missed, I am more than happy to have their -- the current court appointed receiver speak with me, speak with Alissa's expert. We can all get on the phone and figure out if there's anything else missing, we'll take care of it. But that to me is the status quo. And I don't know what would we -- how the situation would be improved by simply kind of turning it upsidedown and bringing a receiver in and kind of starting from scratch. We have that kind of cooperation. I think counsel, I hope, would agree with me.

And then the last -- the last bit on the issue of

fraud. I mean, as counsel said, this is an equitable consideration so the court can really consider that how it wants.

At the end of the day, though, the reason why fraud to me is important is it goes back to this question of transparency. If we're actually hiding something, if we're sitting on information and not telling them, if we're going out and doing things that are destructive to the property and not telling them, that's fraudulent and that would be a grounds for the -- absolutely grounds for a receiver being appointed, if not for other claims. But that's not happening. And I don't hear counsel alleging that. He's frustrated, as we are sometimes, at kind of playing catch up, but there's been complete transparency.

So for all of those reasons, I just think a receivership is not necessary, Your Honor.

Thank you.

THE COURT: Mr. Hersh, I do have one question for you now and it's in response to your first argument to me when you were speaking to me about merits and I'm sure I'll come back to this again.

Merits are relevant here to the extent that they apply to the seven factors of the Canada Bank case. So really what we're talking about is not likelihood of success on the merits. That's clear. It's is there a valid claim. And I get you on

that.

But you had raised an option three. There's option one, these properties are Mr. Huynh's personal possession, the investments were made for him.

Option two, these were a gift to his then wife.

And then you raised option three which is that they're part of the marital community.

I'm not at this point thinking about the mechanics of figuring out who decides that and in what forum and all that because that's not me, I'm pretty sure.

What I am thinking about, though, is that -- I guess my first question is on that front, were you in the case when an answer was filed?

MR. HERSH: No.

THE COURT: Wouldn't the defense have had to assert this as an affirmative defense at the time? Or is it your position that this is just defeating or denying the elements of the claim?

MR. HERSH: I certainly believe it's an element of the claim. His claim is that he was defrauded into providing money that was intended to be solely owned by him. He traced out in the complaint a chain of ownerships that essentially these LLCs would eventually be owned partly by him and then they would be put under another LLC under a corporation in the British Virgin Islands that would be solely owned by him. Those are elements

of his claim and none of that matches up. If a fact finder determines that he was just making these contributions to support a family, then that -- none of that matches up with his allegations so, no, I don't think it's an affirmative defense.

THE COURT: Can his allegations not be read to support option one or option three, which is this is my property or this is the marital community either way and either way, if it is defendant's position that it's her property alone and that it was a gift, we still have the same fight between plaintiff and defendant, right?

MR. HERSH: Well, no, I don't think so, Your Honor, because -- I mean, the Federal Courts try to stay out of marital disputes. And a dispute that is simply saying, you know, divide up this marital property in a way that I should get it because I made this oversized contribution or I was defrauded, say, into making this oversized contribution --

THE COURT: Okay. I follow that but that wasn't really what I was asking and I think it was a poor question on my part.

The contentions made by the plaintiff, one way or another, however you want to look at it, are he has an interest in the property and that is being denied by Ms. -- his ex-wife now, claiming sole possession and ownership.

MR. HERSH: Yeah. But if it -- and that's where it goes to the three factors, right. A fact finder here could

find that he has sole possession. A fact finder could find that we have sole possession. A fact finder could find that they have joint possession because they're in a marital estate and they should be divided however the family law court would do it. But since his claim is sole possession, then he -- that's his claim, is sole possession.

THE COURT: I understand the argument. I understand the argument as you --

MR. HERSH: I'm sorry if you're frustrated. I'm not --

THE COURT: No, I got it. I understand what you're saying now. Thank you.

All right. As I indicated, Mr. Sreecharana, because it's your motion, you have first and last bite at the apple.

MR. SREECHARANA: Thank you, Your Honor.

THE COURT: And if you would care to address at some point the discussion that I just had with Mr. Hersh, I would appreciate it.

MR. SREECHARANA: I intended to address it first.

First -- well, without waiving any arguments, I'm always interested in the three sides of a story, right, and we sometimes see that in cases.

I think the court's sense of this is correct. This shouldn't be framed as, well, there are allegations of it being his sole benefit and that he should be in sole possession.

There's also claims, as I mentioned, that are equitable in nature and quasi-contractual in nature, particularly the constructive fraud claim. It literally -- it's Count 12 and it says, you know, quote, he has, quote, at least an equitable interest in the properties and property maintenance investment, right.

And there's also an unjust enrichment claim. Essentially we fronted the money while they enjoy it 100 percent without any benefit to us.

So there are alternative claims or alternative remedies. I don't think it's fair at this point in the proceedings to pigeon hole us into sole benefit, only a fraud claim, and for those reasons, as I previously mentioned, I think the probable success factor would be met.

I think the right question is has there been evidence produced that Mr. Huynh invested in the properties? The answer is yes. Indisputably yes. This is -- again, it's one factor. It's a sliding scale. I just reiterate that.

A couple of other things and only because I didn't mean to offend counsel about transparency. Maybe I misspoke.

There's no question that when things are -- pop up, counsel addresses them. He has told us that the properties have been uninsured. He's been candid when I asked him about the delinquent property tax. So I don't want the court to be left with the impression that he's been anything other than

candid. My point only was that when we talk about transparency going forward, how do we get that from a third party, effectively, private receiver? How do we get that from a lawyer that's helping clean up corporate acts, you know, piercing the attorney-client privilege. There's not going to be transparency. There's going to be what we're fed and what we're able to get through discovery. That's going to be a challenge and it, as I mentioned, has already been a challenge.

And the notion that, you know, there should be three or four or five parties on phone calls, you know, almost daily talking about the status of these properties and what's going on underscores the point that that's an inefficient use of party resources and particularly since we already have a receiver in place, it would be a duplicative expense of resources and I think the benefit is to have someone oversee this in a neutral manner.

Mr. Hersh also made representation about the defendants' growth category over the least year and what's happened with the Malibu properties. With all due professional respect, we cannot rely on his representation. Mr. Hersh can only do like the other professionals that have been retained what they've been authorized to do, assuming that the defendant remains engaged and that has been a problem and it has been costly. And I don't think that we need the opportunity to relive what's already happened with California. And I

appreciate his representation about that, but it's not something I can counsel my client to rely upon for the pendency of this case while still multimillion dollars of investment money are tied up.

And ultimately that's the end of it, is what's the consequence here if a receiver isn't appointed and it's all going forward as Mr. Hersh suggests?

I have outlined the trouble with that. And I think, again, the more efficient way to deal with this so that we can get to the merits and whether it's option one, two, three or something else can be determined.

THE COURT: All right. Thank you, Mr. Sreecharana.

Give me one moment, please.

(Pause.)

THE COURT: So, Counsel, I'm going to take a brief recess and retake the bench probably in 15 minutes.

All right. Thank you.

(Proceedings adjourned at 2:22 p.m.)

(Proceedings convened at 2:34 p.m.)

THE COURT: All right. Thank you, gentlemen. Please be seated.

Let me start with a recognition of the quality and professionalism of the argument, both written and here today, and in particular the responsiveness of the lawyers.

If I had this in every case, it would make the job

much easier and more pleasant and so I need to acknowledge that when I see it.

I'm going to start with the motions to supplement and all three will be granted.

I certainly understand the notion of a preclusion of information that was available at a previous phase of the matter and the drawbacks to a party that followed the rules and thought that they were beyond an issue only to find out that something is coming back, but in my view -- and particularly because what I'm addressing here is an equitable remedy -- it is more than beneficial for the court to make that decision with the maximum amount of relevant information within the universe from which it evaluates.

And so Docket Numbers 80, 92, and 107, those motions will all be granted.

Getting to the heart of the issue. I took, Mr. Sreecharana, your motion for receivership really to have three discrete components that the court had to consider. The first is the extension of the receivership writ large, so that rather than it being over two properties -- I should say a parcel and a parcel with a structure on it before the fire in Malibu, expanding it from that to five, those plus the two homes and then the undeveloped parcel that is contiguous. That's one.

The second was the issue of the approximately

$2.27 million that were transferred in two tranches to Ms. Chiaravanond. Mr. Huynh's contention is that that money was solely for the maintenance and other associated expenses to the property.

And then the third was an order affecting the ability of Mr. Huynh in the event that the receiver needed additional money to operate that he could pay it in the form of and what then will be treated for all purposes as a loan.

And so I'm looking at all three of those issues here. And I know that the parties did not focus on the last two here today in their presentations, but it was satisfactorily addressed such that I could perform my analysis on those two issues based only on what was written to me.

Here's where I will start. And this is general to the entire motion and all of the arguments.

After having read all of the moving papers and their supporting documentation, I would observe that, as was the case here today in your oral presentations, that counsel for both parties leaned heavily into the proposition dealing with this court's prior findings about plaintiff's -- the merits, essentially, the validity of the plaintiff's claim is the best way for me to put it if I'm putting it close to what the standard is today.

At times the argument went closer to the traditional test element or test -- yeah, test element for injunctive

relief, likelihood of success on the merits, and at other times maybe even straight to just the merits, although there were caveats. Mr. Sreecharana, at one point you acknowledged today maybe the court hasn't found that the arguments or that the positions that plaintiff has put forward are meritorious but rather valid going back to the test and I appreciate that.

I simply want to make the observation that arguments down that road only serve each respective party so far in this case. There are limits to them in terms of the purchase they hold for the arguments the court has to evaluate.

From the perspective of the plaintiff, again, has reminded me a lot that the court has previously found the plaintiff has stated valid claims over the Malibu house and land in the complaint and that there's at least a probability that the defendants defrauded the plaintiff and that's a quote. The conclusion is not written in stone. The court made that finding at a juncture in this case when the defendant, after her first set of counsel had withdrawn, was not engaging, had not retained new counsel, was not appearing, was not communicating with the court or parties, in her own right, and was in danger of being defaulted.

There will be junctures in this case where the defendant, Ms. Chiaravanond specifically, will have an opportunity to show evidence that affects conclusions on this issue, validity or merit or ultimate success.

And so I think there is a limit to how far the argument can go on the plaintiff's behalf that the court's previous findings are -- I almost get the feeling of immutability. And, again, I know that's not what the counsel has stated and has been very careful about it but I think it's worth the reminder.

Flipping this around. From the perspective of the defendants who argue as if now that they are actively defending the case, the court's previous findings have no effect. The court similarly finds little value in that being repeatedly presented as argument because, as I've just indicated, an engaged defendant who is now participating in the litigation through discovery and the motions process will have junctures in this case to argue these points anew. But it doesn't wipe out the findings that the court has already made and properly made in the past under the circumstances as they existed at the time and the defendants are going to have to live with the consequences of that failure to engage in this case as those findings still have the force of the law of the case until such juncture when the court or a finder of fact is permitted to consider whether the evidence properly brought forward at that point might demonstrate otherwise.

All of this is to say, taking the merits decision in this case is a matter for another day and a day that's been prescribed in the court's scheduling order and is down the road

a bit.

With regard to the first issue specifically, I will deny the motion to extend the receivership. On this point, I think ultimately the motion will be granted in part and denied in part, as you will hear.

But with regard to extending the receivership over the Sedona properties, I predicate my finding -- although I understand that there are seven factors and that this -- unlike the Winter factors for a preliminary injunction where any one of them being deficient is enough to derail the application, here they are factors, they are not elements, and so they have to be weighed. But there are some that weigh a lot more heavily than others. And the one that the court has the greatest problem with at the moment, based on the information before me, is number three, the issue of -- hang on for a second, I don't want to lose my place -- of whether the property is in imminent danger of being lost, injured, diminished in value, or squandered. There are other possibilities for the danger but those are the ones that we're focused on in this case.

Again, I thought this was very well argued in both directions what the appropriate inference is to be taken from the facts that the court has before it right now.

And I took, Mr. Sreecharana, in your -- and accept the theme that you proposed to me about the defendants' actions or

inactions to this point are best characterized as being reactive in that only when a problem is pointed out that might go to waste or squander or diminution of the value of the property has anything been done to this point.

And the court recognizes -- and I'll come back to this in a minute -- that under the circumstances of reactivity, there is some risk. If the property taxes are paid as of next week, if the HOA fees are all current now, if the insurance premiums for the home are paid, if the maintenance is kept up and all of these were as a result of problems being pointed out by plaintiff and then defendants now team, including property managers, have addressed them, that's great, but what if we discover tomorrow that one of the properties that isn't being supervised has a meth lab in it that's been run by a gang in Prescott or Sedona for the last couple of weeks and the whole place catches on fire or is just a hazard. There's a danger of reactivity.

The court's resolution of that, though, is that it does appear that the defendant, once she refocused on this after being threatened essentially with default, which she acknowledges in one of the -- in one of her declarations, has been to do the things that one would expect a steward of property to do. It would be different if her response to all of these problems would be to say to the court, I will take care of them myself. The track record is not great. But the

imposition of these third parties now, some of whom are officers of the court who have an obligation to not let certain things pass but others, the management company, the property management company who may not have that but at least have a track record professionally and don't let things slide, gives the court a fair amount of comfort that we have moved away in general -- I'm going to come back to some specifics -- in general from the risk that controls this one factor, the third factor of the Canada Bank test.

Having said all of that, the court is aware that given these problems, when things were left to Ms. Chiaravanond and her LLCs to manage these properties and it didn't happen and we're still finding things even as recently as yesterday with the taxes, that that's not a great track record. The court recognizes that there is a risk. I just conclude at this time, based on the steps that have been taken, that that risk has been sufficiently mitigated and will be further mitigated by some of the conditions that I'm going to order and impose today, which I'll come to in a moment.

First. Counsel for plaintiff points out quite validly that there is currently nothing stopping the defendants from at any point today, tomorrow, or otherwise and particularly after the court enters an order, returning to a pattern of neglect and failure to engage -- again, I'm only talking about the clients here, not the officers of the court or other

professionals involved -- from returning to a pattern of failure to engage and neglect which immediately would put the properties at the same risk they were in before and which resulted in the Malibu property burning to the ground while it was uninsured. Can't control for the fire; can control for the coverage due to the defendants' allowing the coverage to lapse.

So to avoid that possibility, the court will require the following. It will require defendant Chiaravanond to direct the property management company -- I believe it's MCA -- or other appropriate third parties to provide a monthly status report to plaintiff's counsel that all insurance, property tax, association fees, and utilities are current and that all noncosmetic maintenance issues are being addressed.

Those reports shall be delivered on or about -- or, I'm sorry, on or before the 1st of each month.

And if the defendant fails to timely provide, each month during the pendency of this litigation, that report demonstrating the currency of these obligations on the Sedona properties, plaintiff may immediately renew his motion to expand the receivership. And the court, having hinged its denial of the instant motion solely on this third Canada Life factor of lack of immediate danger of loss, diminishment of value, or squandered, the court will summarily grant the motion.

Separately and second, the defendant will provide a

report within one week to the plaintiff's counsel as to what the best efforts were to inquire about and after obtaining fire insurance.

I had asked during the pendency of the oral argument this question of you, Mr. Sreecharana, about were you representing to me that if the receivership was expanded to the Sedona properties, would the receiver necessarily obtain fire insurance for the properties and your answer to me was yes and then -- I don't use the word qualified to be pejorative in any way, but I think it was careful and what you said was best efforts, understanding, for example -- let me leave that to the side.

And so when that report is made by next Thursday, it will allow for the possibility, if there's conferral and the plaintiff is not satisfied, you to reraise this issue and propose to me some other reasonable resolution of the issue of the specific fire danger. And I recognize that there's a universe of potential dangers. This one is top of mind right now because of what happened in Santa Monica, but this is the one that we're focusing on because it's the one potential risk that the court's order thus far still wishes to explore further.

All right. Moving on to the second subset of relief sought in the motion. I will not grant relief in the form of ordering payment of the $2.27 million back over from

Ms. Chiaravanond and the entity defendants for a couple of reasons. The first is that the receivership motion is about the harm, the wasting, and the diminution of the properties and the arguments controlling this issue are inextricable from the merits of the case, but that's not true of monetary relief and this feels like damages at law at least in part.

And if that's true, if the plaintiff wins his fraud claims or contract claims or unjust enrichment claims, that $2.27 million is likely to be the subject in part of any award at law.

Secondly, and relatedly, there's a bit of a disconnect between the receivership claim and its elements and providing monetary relief at this juncture, period. Although the court does see the plaintiff's point that in order to preserve the receivership property, whether all parcels and homes or just the Malibu ones, the receiver needs to have access to funds to conduct that care and to be paid himself or itself if we want to look at Mr. Nach's business as an entity. But, again, this issue can be addressed in the merits phase of the case with a remedy at law rather than equity. And if the remedy at law is upon a finding of defendants' liability, then the award might well reflect receivership costs as a component of damages.

Having said that -- and moving to the third subset, the court recognizes the utility of segregating such costs, receivership costs, for inclusion in a potential damages claim

component. As the plaintiff has suggested, then, I will allow the plaintiff to treat any transfers to the receivership by Mr. Huynh as loans with accompanying consideration such as interest. And to that end, Mr. Sreecharana, if I give you a week, can the plaintiff submit a proposed form of order on that issue with all the features that you would want?

MR. SREECHARANA: Yes, Your Honor.

THE COURT: All right. Thank you.

And the court will approve that upon review.

All right. Counsel, I think that took care of what was in front of me right now.

Again, with my appreciation for the professionalism and the quality of the argument.

I want to ask if anybody does not understand any aspect of the court's ruling?

I know that's different from whether you agree with it, but is there anything that you need clarified that I've said, Mr. Sreecharana?

MR. SREECHARANA: No, I don't, Your Honor. Thank you.

THE COURT: All right. Thank you.

And Mr. Hersh?

MR. HERSH: I suppose my one question has to do with the third part of it with Mr. Huynh contributing money to the receivership.

The receiver at this point is appointed formally only

over the California properties.

THE COURT: That's right.

MR. HERSH: So this would apply only to that receivership?

THE COURT: That's right because that is the receivership right now.

MR. HERSH: Okay. Thank you.

THE COURT: All right. Thank you, Counsel.

And good day to both of you. Be safe.

MR. HERSH: Before we finish, do you want to talk about the timing of the --

MR. SREECHARANA: Your Honor, could we address one thing?

THE COURT: You can.

I have a sentencing going in a few minutes but we should -- we've now devoted an hour and a half to this, we ought to finish it up.

MR. SREECHARANA: I appreciate that.

THE COURT: That's fine.

Mr. SREECHARANA: I'll be very brief.

We filed an ESI protocol update with the court on Tuesday. I think in that protocol we indicated that we intend to get back to the court by tomorrow. I would ask that we have a couple extra days to do that. We've narrowed the issue to one issue. And as I told Mr. Hersh, I'll fall on my sword

here, I'm preparing for trial and I have a number of filings tomorrow, so if we get till next Tuesday to update the court or submit the order, we would appreciate it.

THE COURT: Let's go till Wednesday, which is the 10th?

THE COURTROOM DEPUTY: 14th.

THE COURT: 14th. Okay.

MR. SREECHARANA: Thank you. If we can do it sooner, we will.

THE COURT: All right. Very good.

(Proceedings adjourned at 2:58 p.m.)

C E R T I F I C A T E

I, SCOTT M. CONIAM, do herby certify that I am duly appointed and qualified to act as Official Court Reporter for the United State District Court.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED June 2, 2025.

s/Scott M. Coniam
SCOTT M. CONIAM, RDR, CRR

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Case No. 3:23-cv-08622-JJT

---

REMOTE VIDEO 30(b)(6) DEPOSITION OF MCA FINANCIAL GROUP, LLC, by KEITH BIERMAN
October 27, 2026

---

Phong Thanh Huynh,

Plaintiff,

v.

Alissa Chiaravanond, an individual resident of Arizona, Pacific Shangrila LLC, a Nevada limited Liability company, Cathedral Shangrila LLC, a Nevada limited liability Company, Nido di Stelle LLC, a Nevada limited liability Company, ILU LLC, an Arizona Limited liability company,

Defendants.

---

APPEARANCES:

MAY, POTENZA, BARAN & GILLESPIE, P.C.
By Trevor J. Wainfeld, Esq.
Jeff Edmond, Esq.
Devin Sreecharana, Esq.
1850 North Central Avenue, Suite 1600
Phoenix, Arizona 85004
(602) 252-1900
Twainfeld@maypotenza.com
Appearing on behalf of Plaintiff

CERTIFIED TRANSCRIPT

Sometimes -- in fact, we do have another property that we are managing right now that involves the day-to-day management of the home itself, maintenance, utilities, landscaping, marketing, et cetera.

Q. Do you or MCA hold any licenses with the Arizona Department of Real Estate?

A. No.

Q. Okay. Do you or MCA hold any other licenses -- any licenses from any agency relevant to managing residential properties?

A. Well, the only license that I hold is Certified Public Accountant license in the state of Arizona.

Q. Okay. You have a fair amount of experience or what I'd say substantial experience managing businesses in distress, receivership, bankruptcy, restructuring, and otherwise going through, you know, major changes like a merger. Is that experience -- has that experience been you useful in this case?

A. Yes.

Q. Do you think that experience is part of the reason why you might have been retained in this case?

MR. HERSH: Object to foundation.

A. Potentially.

Q. When is last time you were able to -- when is the last time you heard from Alissa Chiaravanond whether by phone, text messages, e-mail, or other communication method?
A. This summer sometime.
Q. What was that about?
A. She had called me and left a message I believe at the time that the wildfires were happening in Sedona and asking me a question -- to ask me a question about insurance I believe.
Q. Okay. In connection with preparing for this deposition, did you confer with anyone else from MCA?
A. What do you mean by confer?
Q. Did you communicate with anyone else from MCA in preparing for this deposition?
A. Yes.
Q. Who?
A. I asked two of my professional staff that worked on this matter, Paul Bullington and Liam Boyce. I had a conversation with them.
Q. Did you talk with them about insurance matters or something else?
A. I talked with them about gathering information to respond to the subpoena.
Q. Okay. So did you talk with them in

A. Opposing counsel? I had a discussion with Mr. Hersh. Told him I would gather the documents pursuant to the subpoena. And he asked me to send them to him, and I did.

Q. Did you have a conversation with Mr. Hersh about redactions?

A. Generally.

Q. Did MCA instruct Mr. Hersh to apply any redactions?

A. No.

Q. Did Mr. Hersh tell he was going to apply redactions?

A. He said that he would review the material; and to the extent there was a attorney-client privilege information or anything that required redactions, he would do that.

Q. Do you have an understanding how the attorney-client privilege might apply to MCA's documents in this case?

A. I'm an attorney. So I would say generally no.

Q. Okay. Do you have an understanding how the work -- attorney work product protection doctrine to could apply to MCA's documents in this case?

A. Just generally.

Q. And how did you develop that understanding?
A. My experience in other matters.
Q. Did you review the redactions, or did anyone at MCA review the redactions that were applied before documents were produced to Plaintiff?
A. No.
Q. Okay. So MCA did not approve the particular redactions that were applied to the documents?
A. We did not review them. So we did not approve or disprove them.
Q. Did MCA have a position on applying redactions to its documents generally?
A. No. I'll leave that with counsel to determine.
Q. Has MCA taken action to preserve messages, documents, and other electronically stored information that could be accidently deleted or destroyed?
A. Could you describe what kind of action that might be?
Q. Does MCA have a document retention policy?
A. No.
Q. Does MCA take any actions to ensure that documents are preserved?
A. Other than the normal server, you know,

Q. Okay. So for the phone calls that you do not put on your invoices, there would be call logs. Would there be any other record of that phone call?
A. Not that I'm aware of.
Q. Do you keep notes from your phone calls?
A. Depends on the call.
Q. Do you keep notes on this engagement?
A. Generally, no.
Q. Okay. And you have talked to Matthew Hersh throughout this year about the management of the properties, right?
A. Yes.
Q. You've talked to him fairly regularly, right?
A. Yes.
Q. At least a couple of times a month, right?
A. That's probably about right.
Q. And Ms. Chiaravanond has not been on any of those calls, has she?
A. Not recently, no.
Q. What do you mean by recently?
A. Well, not within the last six months that I can recall. Maybe longer.
Q. Okay. PU mentioned site visits and -- you mentioned site visits. Have you or anyone from your

staff been inside the Cross Creek property since February of 2025?

A. No.

Q. Why not?

A. It's Ms. Chiaravanond's residence. I know she is living there. And it's not appropriate. We haven't been invited into her house necessarily. But given the fact that she's living there and didn't think it was necessary.

Q. Has MCA ever requested access to the Cross Creek house?

A. We've been to the Cross Creek house several times, yes.

Q. Has MCA ever requested access to the interior of the Cross Creek house?

A. No, not that I can recall.

Q. Okay. Did Ms. Chiaravanond at the beginning of that engagement tell you that she didn't want anyone to have access to the Cross Creek house?

A. No.

Q. So then how did you develop the understanding that MCA should not visit the Cross Creek house?

A. I didn't say we shouldn't visit the Cross Creek house. As I said, we've visited the Cross

Creek house several times during the engagement. My point is that with Ms. Chiaravanond living there, it's her private residence. It's really up to her if she would like to have us inside the house or not.
Q. You mentioned an insurance inspection, right?
A. Yes.
Q. Did anything about that insurance inspection involve any portion of the interior of the house?
A. I believe that insurance inspection was 288 Back O Beyond; and, yes, it did involve the inside of the house.
Q. Okay. And so you understand that insurance could require -- that insurance compliance could involve issues with the interior of the house, right?
A. It could, yes.
Q. And so how is MCA ensuring that the house remains compliant with what its insurer requires?
A. Well, I'm not aware of any of requirements by the insurance company related to the inside of the house. If the insurance company did want to do an inspection of the house, interior of the house, we would certainly facilitate that.
Q. So when talk about visits to the Cross Creek house, you're referencing the exterior of the house,

Q. Okay. So it sounds to me like the only knowledge that you would have of the interior of the house is if there is anything that Ms. Chiaravanond has chosen to share with you; is that correct?
A. Yes. If she were to raise an issue about the interior of the house, that would be the way I would know about it.
Q. With respect to the exterior of the house aside from that one visit, you would have no knowledge as to the condition of the exterior unless Ms. Chiaravanond chose to share it with you, correct?
A. Well, I mean, I suppose if you mean if there is an issue that occurs on the outside of the house, obviously we're not there every day, Ms. Chiaravanond would let us know; and we would take corrective action.
Q. Do you know the state of that property right now?
A. My understanding is the state of the property is that it's a residence that's in good condition and operable.
Q. Okay. And what is that a based on?
A. Based on inspections we've done and photos we've taken. The fact that I'm not aware of any issues by anyone, including Ms. Chiaravanond, about

A. It would have been a phone call.
Q. Okay. Do you recall receiving any invoices from the pool service?
A. No.
Q. So is there any written record of who that pool service is?
A. I don't believe it would -- I'd have to go back and probably look at -- look at like Google Maps and figure out who the pool service -- if I saw the name I would recall it. I just don't recall who it is.
Q. Do you recall when you contacted the pool service?
A. Not specifically, no.
Q. Would it have been sometime this year?
A. I think it was last year.
Q. Are you aware of -- are you aware of any specific maintenance or construction work that has been done to the Cross Creek property this year?
A. No.
Q. I'll move on to the 95 Ravens Call property. Has an MCA employee ever entered or inspected that property?
A. Well, it's dirt lot. So no.
Q. And do you know that it's a dirt lot because

of what?
A. Because that's my understanding of it, because that's what the property tax records reflect, because that's what Google Maps shows when you look at the property aerially.
Q. Okay. And so the only reason MCA has not visited that property because it is a dirt lot?
A. Yeah. I mean there's not much to visit there.
Q. Okay. Do you know if that property has insurance?
A. I don't believe it does.
Q. Did you or Defendants ever attempt to obtain insurance related to that property?
A. I don't know if Defendants have. I don't recall specifically discussing that property with the insurance broker.
Q. Are you aware of anyone who is I'll say keeping an eye on that property?
A. I'm not sure what you mean. Like, going there regularly to look at the dirt lot?
Q. So it would be possible that vagrant could be living on that property, right?
MR. HERSH: Object to form.
A. Anything is possible. It's highly unlikely.

It's a gated community in Sedona of very wealthy homes. So I think it's a low probability that that's happening.

Q. (By Mr. Wainfeld) You would not know that, right?

MR. HERSH: Object to form.

A. If that was, in fact, the case and there was a problem, I have confidence that word would get back to me through Alissa or some other person.

Q. (By Mr. Wainfeld) Okay. You personally have never been to any of the three Sedona properties, correct?

A. Correct.

Q. I'm going to share with you what I'm marking as Exhibit Number 6. And if I did not mark the MCA 94 as Exhibit Number 5, I do want to make sure I mark that as Exhibit Number 5.

(Exhibit 6 marked.)

COURT REPORTER: Yes, you did.

Q. (By Mr. Wainfeld) All right. Excellent.

So this will be Exhibit Number 6. This is an e-mail containing the MCA invoice in this engagement from March 2025. Do you see that?

A. Yes.

Q. I'm going to scroll down to the invoice

A. I don't know for sure.
Q. At about this time did you stop communicating with Ms. Chiaravanond on a regular basis?
A. I believe I started communicating more with Mr. Hersh at this time.
Q. Since December of 2025 about how often have you communicated with Ms. Chiaravanond directly?
A. I don't know.
Q. Do you know how many times you've communicated with Ms. Chiaravanond directly since December of 2025?
A. I don't know.
Q. You mentioned that you had perhaps communicated with her earlier this year. You said you had tried that call her, and I believe you said that she called you about wildfires earlier this year. Do you recall any other times that you've communicated directly Ms. Chiaravanond since December of 2025?
A. I may have but I don't recall specifically when that was.
Q. Okay. Aside from the time that you tried to get in touch with her over the summer, have you made any efforts to contact her directly since December of

2025?
A. Not that I can recall. Most of my communications have been with Mr. Hersh.
Q. Okay. And have you had any conversations with Mr. Hersh related to the physical state of any of these Sedona properties since December of 2025?
A. Yes.
Q. When was that?
A. Well, for instance, recently I let Mr. Hersh know about an issue that the Sedona.org brought to my attention regarding a potential roof leak at the 288 Back O Beyond property. And that I have the property manager authority to have the roof inspected, and if necessary get a quote to have the roof repaired.
Q. Okay. Have you had any discussions with Mr. Hersh regarding the physical state of the Cross Creek property since December of 2025?
A. I don't believe there have been any issues that I recall having to discuss with him about that, no.
Q. Okay. And he has not raised any issues with you, correct?
A. Not that I can recall.
Q. I'm ow scrolling down on the invoice itself. And in November of 2025 this invoice reflects that

Q. During the year of 2026 do you recall having any Zoom meetings with Ms. Chiaravanond?
A. I don't recall any with her.
Q. Would records of any Zoom calls be in either of the documents that have already been produced or those that Mr. Hersh has?
A. Not if we did that have any Zoom calls.
Q. Sure. But if you did, there would be record of those in those documents?
A. Presumably, yes.
Q. And we discussed that one time Ms. Chiaravanond called you earlier this year regarding the Sedona wildfires. As you sit here, do you recall any other phone calls with Ms. Chiaravanond today -- let me ask that question a little bit differently.
We discussed that you had called Ms. Chiaravanond about a month ago. We also discussed that Ms. Chiaravanond called you earlier this year about a Sedona wildfire. Have you communicated with Ms. Chiaravanond through any means other than the ones we just discussed in the year 2026?
A. Not that I can recall.
Q. And why did MCA cease communicating with Ms. Chiaravanond directly around November of 2025?
MR. HERSH: Object to form.

A. Not that I can recall.
Q. What bank accounts have been used to receive rent or pay expenses for the three Sedona properties to your knowledge?
A. The Chase account that's in the reports that I provide. There is also likely an account at Sedona.org that collects payments from renters and pays the expenses of the property. I don't have access to that account. That's within their management. Those are the two that I recall. There may be others but those are the two that I deal with regularly.
Q. I think we discussed earlier that expenses have been paid from your account, correct?
A. When you say my account --
Q. Trust account held for Ms. Chiaravanond.
A. Yes. One time expenses were paid from that for the insurance premium.
Q. And are you aware of Mr. Hersh paying expenses for the Sedona properties from his trust account?
A. Yes.
Q. Which ones?
A. I believe he paid taxes, property taxes.
Q. Do you recall when that property tax payment

occurred?
A. Not specifically. It's in my reports and on the Yavapai County website.
Q. Are you a signor on the Chase account?
A. No.
Q. You're only permitted to view the account summaries, correct?
MR. HERSH: Object to form.
A. Yeah, I receive a statement each month as I mentioned. If I needed to become a signor on the account, I could use the power of attorney to do that but that hasn't been necessary at this point.
Q. (By Mr. Wainfeld) Has MCA undertaken -- beyond reviewing have the Chase bank statements, has MCA done other work to reconcile income and expenses related to any of the Sedona properties each month?
A. I'm not sure what you mean by reconcile.
Q. Has MCA obtained receipts?
A. Well, the only receipts would be from Sedona.org for the rental property, and we have -- we do receive the total amount received by Sedona.org that's paid to the Chase account every month.
Q. The Cross Creek property must also have expenses, right?
A. Yes.

A. No. Sedona.org handles that. I did receive a quote from the roofing company after it was inspected, and I approved that expenditure with Sedona.org. And they're handling the vendor to complete those services.

Q. And that is the quote for which you had attempted to get in touch with Ms. Chiaravanond directly, correct?

A. Yes. I called her just to make her aware of the issue.

Q. And why did you think she should be aware of that particular issue?

A. It's a more significant issue in the grand scheme of things that happen at the property. It's actually -- for 288 BOB it's actually somewhat rare that there's a problem.

And so in this particular case this was an issue, and at that time I wasn't sure how big of an issue it was. It turns out this is an issue but not a major issue. And I thought she would want to know about it.

Q. And what is the work that needs to be done to the roof?

A. It's a pull up of some of the shingles, and then replacing some of the underlayment, and then

THE VIDEOGRAPHER: We are back on the record. Time is 4:13.

BY MR. WAINFELD:

Q. Okay. Mr. Bierman, have you ever had a discussion with the Defendants, or their counsel, about listing the Cross Creek property for rent?

A. No.

Q. Have you ever been instructed not to list the Cross Creek property for rent?

A. No.

Q. Have you ever discussed Alissa paying rent for living at that property?

A. No.

Q. Are you aware of any efforts by the Defendants to rent the Cross Creek property at any time?

A. No.

Q. So you were not aware that the Defendants discussed listing those properties for rent with Foothills Rental in February of 2025?

A. I was not aware of that.

Q. And that is the same month that MCA was retained by Ms. Chiaravanond, correct?

A. Yes.

Q. And were you aware that Ms. Chiaravanond

with Ms. Chiaravanond, and counsel, to determine when and how those property taxes would be paid, ultimately, and to accurately report the status of the unpaid taxes, the payment of the taxes.

And then, also, I believe I put in my report to the Court, and to the Plaintiff's and parties, my understanding of any consequences associated with the unpayment of the past taxes.

Q. And are you aware of either MCA, or anyone on behalf of the Defendants, checking the Yavapai County Treasurer's website since December of 2025?

A. If that's when the taxes were paid -- I -- I can't recall exactly when the taxes were paid, but after they were brought current -- whenever that was, I don't believe anyone from MCA has checked the -- the Yavapai County site since then.

Q. Do you know if they are current -- if the property taxes for the three Sedona properties are current today?

A. I would have to look. I don't know as I sit here.

Q. Have you assigned anyone at MCA to look at the Yavapai County Treasurer's website on a regular basis?

A. No.

Q. Have you ever tasked anyone with looking at the Yavapai County Treasurer's website for the Sedona properties' task -- tax status?
A. No, I've done that myself.
MR. WAINFELD: I will pull up, and mark as Exhibit Number 29, Document 155.
(Exhibit 29 marked for identification.)
BY MR. WAINFELD:
Q. And do you recognize this as the declaration that you signed regarding your December 2025 report?
A. That's what it looks like.
Q. And do you recognize this as your -- as the December 2025 report?
A. It looks like it is.
Q. Okay. This is the first page of that report, and if we scroll down to payment of property taxes, under paragraph 5, it identifies that the second half of 2025 property taxes are not due until May 1, 2026, do you see that?
A. Yes.
Q. Do you know if those are paid?
A. I would have to look. I don't know as I sit here today.
Q. Have you undertaken any effort to confirm, before today, whether that was paid?

A. No, not specifically.
Q. I'm pulling up a 2026 property tax statement that was downloaded from the Yavapai County website last week. Are you familiar with these kinds of statements?
A. Yes.
MR. WAINFELD: Okay. And I'll mark this as Exhibit Number 30, and this is the document entitled "2026 95 Cross Creek Property Tax Statement."
(Exhibit 30 marked for identification.)
BY MR. WAINFELD:
Q. Going to scroll down -- do you see that it shows prior delinquent taxes as of October 26, 2026, in the amount of $14,317.06?
A. I see that, yes.
Q. Okay. Were you aware of that before today?
A. No.
Q. Okay. And there's another property tax payment due on November 2, 2026, do you see that?
A. I see that.
Q. Was that -- were you aware of that before today?
A. I'm aware that that's when property taxes are paid.
Q. Did you have a plan to pay the property

taxes on November 2, 2026, related to 95 Cross Creek?
A. I've not specifically discussed that with Mr. Hersh.
Q. Do you have access to funds -- to funds sufficient to pay both the delinquent taxes and the taxes due on November 2, 2026, on behalf of 95 Cross Creek?
A. Not currently.
Q. Bringing up another 2026 property tax statement. This one is entitled "2026 288 BOB Property Tax Statement." This was also downloaded from the Yavapai County website last week.
MR. WAINFELD: I will mark this as Exhibit Number 31.
(Exhibit 31 marked for identification.)
BY MR. WAINFELD:
Q. And I'll scroll down to the bottom. Do you see that 288 Back O Beyond has prior delinquent taxes due of $6,732.97?
A. I see that.
Q. Were you aware of that before today?
A. No.
Q. And it says, first half of it -- there's another tax payment due on November 2, 2026, correct?
A. Yes.

Q. And as before, do you have any plan in place to make that payment by November 2, 2026?
A. I will discuss that with Mr. Hersh.
Q. Do you have access to funds sufficient to pay both the delinquent amount and the amount due on November 2, 2026?
A. Not -- not currently within my possession.
Q. Okay. And I'm pulling up a third 2026 property tax statement.
MR. WAINFELD: I will mark this as Exhibit Number 32, and this is the 2026 property tax statement for 95 Ravens Call Place.
(Exhibit 32 marked for identification.)
BY MR. WAINFELD:
Q. This was also downloaded from the Yavapai County Treasurer's Office last week, and it shows a prior delinquent tax due as well, correct?
A. It does.
Q. In the amount of $2,300.84, right?
A. Yes.
Q. And were you aware of that before today?
A. I have not looked into that issue before today, no.
Q. And it also has a tax payment due on November 2, 2026, correct?

A. Yes.

Q. And do you have access to funds, on behalf of 95 Ravens Call, to pay the outstanding amount due in property taxes?

A. No, I do not currently. No.

Q. And you have no plan to pay any of the outstanding property tax payments as you sit here right now, correct?

A. I will be discussing that with Mr. Hersh.

Q. I understand that you'll discuss it with Mr. Hersh, but you have no plan to pay that property tax outside of a discussion with Mr. Hersh, correct?

A. Correct. The plan is to discuss it with Mr. Hersh.

Q. And you have access to these statements on the Yavapai County Treasurer's website, correct?

A. Yes.

Q. Okay. Has anything prevented you from looking at those?

A. Not necessarily, no.

MR. WAINFELD: And I'm marking -- I'm pulling up the October 2026 report that was filed on your behalf in this case, and I'll mark this as Exhibit Number 33.

(Exhibit 33 marked for identification.)

extent there was anything that came up in that search that could be relayed to the Court through my report, but two, to also just verify what the broker was telling me about the difficulties they were encountering, in the Arizona market, getting insurance for this property.

Q. And you wound up including information on insurance in that May 2020 -- in the report filed May 30, 2025, correct?

A. I did it in a report. I don't know -- it's that date or not, but I -- I put some information in the report.

Q. Would you have taken any steps to verify the information that was supplied by Grok before putting it into the report?

A. It depends on what information I put in, and whether it was verifiable, or material enough to be verifiable.

Q. You testified earlier --

A. -- was --

Q. -- MCA has never had a direct communication with any of the HOAs in this matter, correct?

A. Not directly, correct, only through counsel.

Q. What do you mean through counsel? Have you seen a communication from the HOA through counsel?

A. If I recall, there were some communications Mr. Hersh referenced in e-mails about HOA, and payment of the HOA dues.

Q. And do you know if those were in -- in those communications, did you see any communications from the HOA, or were they just communications from Mr. Hersh confirming that payments had been made?

A. I don't recall specifically.

Q. Do you recall if those communications were in writing?

A. I believe I saw some communications in writing, referencing HOA. I don't recall anything more specific than that.

Q. If you had those communications in writing, would they have been included in the materials that you provided to Mr. Hersh to respond to the subpoena?

A. Yes.

Q. Do you know if the 288 Back O Beyond HOA is paid current?

A. No, I don't know as I sit here today.

Q. Who makes those payments?

A. Well, it could come from any number of sources. It could come from Mr. Hersh. If I was asked, it could certainly come from the Chase account, or if Alissa made the payment, it would come

from, likely, the Chase account as well.
Q. Who's responsible for ensuring that those payments are made?
A. Well, I think it's -- obviously, to the extent there's an issue with the HOA, where the HA -- HOA is threatening, you know, some kind of action or a lien, I -- I guess it would be incumbent upon everyone to make sure that those payments were made.
Q. Okay. Do you know if the Cross Creek HOA is paid current?
A. I don't know, for sure, as I sit here today.
Q. When's the last time you remember receiving confirmation that the Cross Creek HOA had been paid?
A. I don't recall.
Q. Okay. I'm going to pull up an email that does not contain a Bates number, but this is an email that Devin Sreecharana received from Adam Nach last week, do you see that?
A. Yes.
Q. I guess -- so about ten days ago. I'm going to scroll down -- like for you to read that email to yourself.
A. Okay. I've read it.
Q. This shows that an attorney for the Cross Creek HOA reached out to Mr. Nach, regarding a --

regarding collections for those properties within the Cross Creek HOA, correct?
A. I see that.
Q. Okay. And have you ever seen a -- any communication like this, at any time this year?
A. No, and I'm actually rather shocked that Adam Nach didn't send this to me.
Q. Okay.
A. He sat on it, apparently.
Q. These are the -- this -- 95 Cross Creek is the property that Ms. Chiaravanond lives at, correct?
A. Yes.
Q. And HOAs typically mail things like this to their residents, correct?
A. That's been my understanding. Sometimes HOAs go electronic, that's, I guess, more common these days.
Q. And you are not on the HOA's list of recipients for e-mails, correct?
A. Not to my knowledge.
Q. Do you know who is?
A. I don't. I assume it's Alissa Chiaravanond.
Q. Okay.
MR. WAINFELD: And I'll mark this as Exhibit Number, I -- I think, 35, is that correct?

THE REPORTER: I have -- MCA 0221 is 35, and then, did you want to use the Grok search as an exhibit?

MR. WAINFELD: Yes. I'll -- I'll do the Grok search as Exhibit 36.

(Exhibit 36 marked for identification.)

THE REPORTER: Okay. So this should be 37 then.

MR. WAINFELD: And then, this will be 37.

THE REPORTER: Yeah. Correct.

MR. WAINFELD: And for the sake of the record, this is the document entitled FW underscore, and then there's an open parentheses, 746315. I'm marking -- and then it continues. I'm marking that document as Exhibit Number 37.

(Exhibit 37 marked for identification.)

MR. HERSH: Trevor, is this included in the -- is it a packet of documents you sent earlier --

MR. WAINFELD: It --

MR. HERSH: -- today?

MR. WAINFELD: It is.

MR. HERSH: What's the title of it, just so I can pull it up --

MR. WAINFELD: The one I just read out.

It's FW underscore, and then there's an open parentheses, 7 --

MR. HERSH: Got it.

MR. WAINFELD: -- 315.

MR. HERSH: Got it.

MR. WAINFELD: And I'm now opening what I'll mark as Exhibit Number 38, and this document is entitled "FW_95 Cross Creek Circle and Ravens Call Place," and then it continues.

(Exhibit 38 marked for identification.)

BY MR. WAINFELD:

Q. This is another email from Mr. Nach, and this is to Patricia Hartman and Devin Sreecharana, do you see that?

A. I see that, yes.

Q. And this is from yesterday, right?

A. It is.

Q. Okay. Scroll down and -- can you read that email and let me know when you're done?

A. Okay. I've read it.

Q. And this email indicates that there had been assessments and water-related fees that had not been paid since early 2025, do you see that?

A. I see that, yes.

Q. Okay. And do you also see that this email

states that the residence located at 95 Cross Creek Circle is in a state of disrepair?

A. I see -- that is what it says, yes.

Q. Do you have any reason to dispute that description of the property?

A. I don't know what this person is referring to. Are -- are there no specifics provided about it? I'd certainly like to learn more about that, but there's no -- there's no discussion that allows me to understand what the nature of the, quote, "disrepair" is.

Q. And is this the first time that you've seen a message like this from the Cross Creek HOA?

A. Yes.

Q. Okay. Are you aware of any HOA assessment payments being made since early 2025?

A. I can't specifically recall any as I sit here today.

Q. Okay. Do you have any documents you would review to confirm whether those payments were made?

A. No, other than the documents that I -- I've already produced.

Q. Okay. You would have expected Alissa to receive notices of -- like that, before Mr. Nach, correct?

A. Well, I think -- I think notices should have been sent to her, yes.
Q. Okay. Is it possible that she received those notices and did not tell you?
MR. HERSH: Object to form.
THE DEPONENT: It's possible. I would probably consider it unlikely, but it -- it is possible.
BY MR. WAINFELD:
Q. Why would you consider it unlikely?
A. Well, I would think that, if she received a notice like that, that required action and payment, that she would forward that to me to handle that particular issue. I don't know why she wouldn't, let's put it that way.
Q. Do you know how many email addresses Ms. Chiaravanond has?
A. No.
Q. Do you know how often she checks her email?
A. I don't know that either.
Q. Do you know how often she checks her mail?
A. I don't know.
Q. Okay. Has MCA ever reviewed any operating agreements, articles of amendment, resolutions, or other corporate documents related to Cathedral

Q. For the sake of the record, I'm going to open that document back up. It was Exhibit Number 29, and we looked through this document earlier, correct?
A. We did.
Q. And we had discussed that it does not discuss property taxes, correct?
A. We did discuss that, yes.
Q. Do you know if it discusses anything about the Cross Creek HOA?
A. It does not.
Q. Do you know if any of your reports have discussed the Cross Creek HOA?
A. My recollection is, they do not discuss that, no.
Q. So in connection with preparing reports, did you prepare the first draft of each report?
A. Yes.
Q. Did counsel for Defendants ever prepare the first draft of a report?
A. Not that I can ever recall.
Q. Did anyone, aside from you, review any draft report on behalf of MCA?
A. I don't believe so.
Q. Defendants' counsel also reviewed those

reports before they were finalized, correct?
A. Yes.
Q. And Defendants' counsel provided you with suggestions for those reports, correct?
A. Comments and suggestions for my consideration, yes.
Q. Did they ever provide you with a redline of any report?
A. There may have been, from time to time, yes.
Q. Did Ms. Chiaravanond ever review a report before it was finalized?
A. I think, if you have the initial reports -- she reviewed.
Q. Did you and she ever have a difference of opinion in connection with the contents of any report?
A. No, not that I can recall.
Q. Have you and Defendants' counsel ever had a difference of opinion in connection with the contents of any report?
A. No. No. No -- no major differences of opinion, it was really just wording and clarifications.
Q. Okay. Do you know -- did Defendants or you file the final PDF?

I, KEITH BIERMAN, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

______________________________
Signature of Deponent
( ) No Amendments
( ) Amendments Attached

Acknowledged before me this _____ day of ______________, 2026.

Notary Public: ________________________

My commission expires _________________

Seal:

REPORTER'S CERTIFICATE

We, Linnea Busby, Certified Court Reporter, and Autumn Biggins, Certified Court Reporter, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

We further certify that this deposition was taken by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

We further certify that we are not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, we have affixed our signatures this 9th day of November, 2026.

Linnea Busby

Linnea Busby, PCR
My Commission Expires: October 28, 2028

Autumn Biggins

Autumn Biggins, CER
My Commission Expires: July 4, 2029

# EXHIBIT D

## To be filed Under Seal